PER CURIAM.
Renaldo D. McGirth appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See Art. V, § (3)(b)(l), Fla. Const. For reasons set forth below, we affirm McGirth’s convictions and death sentence.
FACTUAL AND PROCEDURAL HISTORY
Overview
Renaldo McGirth was convicted of the 2006 first-degree murder of Diana Miller. *782 McGirth, who was eighteen years old at the time of the murder, was also convicted of the contemporaneous attempted first-degree murder with a firearm of Diana’s husband, James Miller, robbery with a firearm of James and Diana Miller, and fleeing to elude a law enforcement officer operating a marked patrol vehicle. After the penalty phase proceeding, the jury recommended that McGirth be sentenced to death for the murder of Diana by a vote of eleven to one. We first discuss the factual and procedural history of the case. We then address the guilt phase and penalty phase issues raised by McGirth.
The Guilt Phase
The evidence at trial established that James and Diana Miller (“the Millers”), both in their sixties and married for forty-two years, lived in The Villages, a gated retirement community situated in Marion County, Florida. Their daughter, Sheila Miller, who was in her late thirties at the time, was residing with them while she recovered from injuries sustained in an automobile accident that left her confined to a wheelchair.[1]
McGirth, a prior acquaintance of Sheila, Jarrord Roberts, and Theodore Houston, Jr., visited Sheila at the Miller home on the afternoon of July 21, 2006.[2] Sheila greeted McGirth with an embrace at the front door, after which the three men followed her inside the residence. James Miller saw the three men enter his home and observed Sheila embracing one of them. He excused himself as it was near noon and he had to shower for a haircut appointment scheduled for 1:00 p.m. that day. Thereafter, McGirth, who had entered the home with a black backpack, set the bag down on the floor and the three men joined Sheila in the living room for some conversation. After some discussion, Sheila, McGirth, and Houston went into Sheila’s bedroom, while Roberts remained in the living room with Diana. Once in the bedroom, McGirth pointed a small, silver gun in Sheila’s direction and instructed Houston to tape Sheila’s mouth and bind her wrists with duct tape that had been purchased at a Dollar General store on the way to the Miller residence. Diana was then called into Sheila’s bedroom where McGirth pushed her onto the bed. Sheila told Diana to give McGirth all of her money. Diana responded that she only had seventy dollars and explained that she did not keep that kind of money at the house. McGirth, in turn, insisted she had money because she lived in The Villages. After agreeing to get the money, Diana raised her hands in the air and was making her way toward the bedroom door to retrieve money when McGirth stood in front of the bedroom door and shot her once in the chest, causing her to fall on Sheila’s bed. McGirth then instructed Houston to pick up the shell casing from the floor and wipe down any objects the men had touched to remove fingerprints. As she bled on Sheila’s bed, Diana whispered to McGirth, “Please call 911; you just shot me in the heart.” However, her pleas for help were ignored.
At some point, Roberts collected wallets and car keys belonging to the Millers and *783 handed them to McGirth. In the meantime, James had just finished his shower when he was grabbed by the arm and dragged to Sheila’s bedroom where he was forced to lie on the floor while one of the men pinned his head with a foot. After the men obtained the couple’s credit cards and a personal identification number, Diana, still conscious, was taken to the computer room in an unsuccessful attempt to purchase cell phones online. A few minutes later Diana was able to crawl back into Sheila’s bedroom.
McGirth and Houston removed Sheila from the home and Roberts placed her in the Millers’ van. As Roberts and Sheila remained in the van, McGirth and Houston returned to the home. Soon thereafter, as Houston was leaving the house with some items, McGirth shot James and Diana in the backs of their heads as they lay on the bedroom floor. James survived the gunshot wound and was able to climb out of the bedroom window and summon the assistance of a neighbor.
McGirth, Roberts, and Sheila left in the Millers’ van, while Houston followed in the silver Ford in which the men arrived. Following McGirth’s orders, Sheila withdrew $500 from an automated teller machine (ATM) nearby and gave the money to McGirth, who subsequently divided the money into thirds. The four then drove to a K-Mart store in Belleview where McGirth and Sheila attempted to locate a particular type of cell phone. A few minutes later the men left the silver Ford in the K-Mart parking lot and took Sheila in the van to a mall in Gainesville. At the mall, efforts to withdraw money from various ATMs and purchase items from stores failed.
At the Miller residence, law enforcement officers secured the scene and issued a BOLO (“be on the lookout”) alert for a red van occupied by three black males and a possible kidnap victim. A police officer spotted the van at a convenience store in Ocala where McGirth was observed getting out and leaving the passengers in the vehicle. When McGirth returned and drove the vehicle out of the parking lot, the police officer activated his siren and lights which prompted McGirth to pull over. As the officer approached the vehicle, one of the men in the van told McGirth to “just shoot the cop.” McGirth responded that he had it handled. When the officer ordered the driver to shut the van off, McGirth sped away. A high-speed chase in excess of 100 miles per hour ensued. As he drove the vehicle while being pursued by the police, McGirth handed the gun to Houston and ordered him to shoot Sheila because she could identify them. Houston, however, did not do so. The police ultimately used stop sticks to slow the van and then disabled it by employing the PIT maneuver,[3] which caused the van to roll several times. Sheila was found inside the van, and Houston was attempting to pull himself from underneath the van when police took him into custody. McGirth and Roberts were able to get out of the van and fled in opposite directions, but were apprehended and taken into custody shortly thereafter.
The police found bloody, folded money totaling $259 in McGirth’s pocket, and his fingerprints were identified on two paper items from James’s wallet.
Testimony was presented on the gunshot wounds inflicted on Diana. Dr. Julia Martin, the medical examiner, opined that the gunshot wound to the head would have rendered Diana immediately unconscious and dead soon thereafter, but that the wound to her chest would not. Dr. Martin *784 concluded that Diana died as a result of the gunshot wound to her head.
The jury found McGirth guilty of first-degree murder of Diana Miller, attempted first-degree murder of James Miller, robbery with a firearm, and fleeing to elude law enforcement,[4] and the case proceeded to the penalty phase.
The Penalty Phase
During the penalty phase, the State presented victim impact testimony from four witnesses who described Diana Miller as funny, playful, caring, a good friend, and an accommodating person who enjoyed traveling with her husband and friends and playing golf and softball. Their testimony revealed that Diana’s softball team made tributes in her name and dedicated its fall season to her. A memorial service was held for Diana and, after a silent prayer, the team released balloons in the air in her honor. The softball team also placed Diana’s retired team jersey along with her photograph and a medal she won in softball in a shadow box and brought it to softball games. A group of women in her community placed a quarter-page advertisement in a newspaper in memory of Diana, which expressed how much she was missed.
The State also presented evidence from Dr. Martin, the medical examiner, who estimated that anywhere from fifteen to thirty minutes passed between Diana’s chest wound and head wound. She also testified that there was nothing in her examination which would lead her to conclude that Diana lost consciousness as a result of the chest wound before the infliction of the head wound. The medical examiner explained that as a result of her chest wound, Diana would have experienced pain, difficulty in breathing, and anxiety.
The defense presented mitigation testimony from McGirth’s family members and pastor. The evidence showed that McGirth had a difficult time growing up because he did not know his biological father and had poor male role models throughout his life.
At the conclusion of the penalty phase, the jury recommended by a vote of eleven to one that McGirth be sentenced to death for the murder of Diana Miller. After conducting a Spencer hearing,[5] the trial court entered its sentencing order in which it found five aggravators: (1) the murder was cold, calculated, and premeditated (CCP), to which it assigned great weight; (2) the murder was heinous, atrocious, or cruel (HAC), to which it assigned great weight; (3) McGirth had a prior violent felony, based on McGirth’s contemporaneous conviction for the attempted first-degree murder of James Miller, to which it assigned great weight; (4) McGirth engaged in the commission of a robbery at the time of the murder, to which it assigned great weight; and (5) the murder was committed primarily to avoid arrest, to which it assigned moderate weight. As a statutory mitigating circumstance, the trial court found McGirth’s age (eighteen), to which it assigned significant weight.
The trial court found fifteen of the eighteen nonstatutory mitigating factors pro *785 posed by McGirth: (1) McGirth had a close bond with his siblings, to which the court assigned very slight weight; (2) McGirth grew up in a financially poor family, to which the court assigned little weight; (3) McGirth grew up in an abusive home, to which the court assigned little weight; (4) McGirth was neglected by his custodial parents, to which the court assigned little weight; (5) McGirth’s substance abuse, to which the court assigned very slight weight; (6) McGirth’s intermittent exposure to positive role models, to which the court assigned some weight; (7) testimony which characterized McGirth as a follower and not a leader, to which the court assigned no weight; (8) McGirth’s diagnosis of conduct disorder, to which the court assigned very little weight; (9) McGirth’s diagnosis of antisocial personality disorder, to which the court assigned very little weight; (10) McGirth’s exposure to people with criminal histories, to which the court assigned some weight; (11) McGirth’s strong religious background, to which the court assigned little weight; (12) McGirth’s good courtroom behavior, to which the court assigned slight weight; (13) McGirth suffered significant family losses, to which the court assigned little weight; (14) McGirth can benefit from a structured environment, to which the court assigned slight weight; and (15) McGirth was deprived of a relationship with his biological father, to which the court assigned some weight.[6] The trial court concluded that the aggravating circumstances in this case outweighed the mitigating circumstances and sentenced McGirth to death.
ISSUES ON APPEAL
On direct appeal, McGirth raises the following eight issues: (1) whether the trial court erred in admitting Williams rule evidence[7] in the guilt phase that had more prejudicial effect than probative value; (2) whether the trial court erred in its response to a jury question concerning the law on principals; (3) whether the trial court erred in admitting excessive and inflammatory victim impact evidence during the penalty phase; (4) whether a prosecu-torial remark during the. penalty phase closing argument warrants a new penalty phase trial; (5) whether the trial court erred in finding the cold, calculated, and premeditated aggravator; (6) whether the trial court erred in finding the heinous, atrocious, or cruel aggravator; (7) whether the trial court erred in finding the avoid arrest aggravator; and (8) whether Florida’s death penalty statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and related cases. In addition to the issues that McGirth raises on direct appeal, this Court must also consider whether there is sufficient evidence to support his convictions and whether the death sentence is proportionate. We begin our discussion of these issues with our mandatory review of the sufficiency of the evidence to justify McGirth’s convictions. We then continue with McGirth’s guilt phase claims and proceed to his penalty phase claims. We conclude our analysis by reviewing the death sentence for proportionality.
Sufficiency of the Evidence
“In appeals where the death penalty has been imposed, this Court independently *786 reviews the record to confirm that the jury’s verdict is supported by competent, substantial evidence.” Davis v. State, 2 So.3d 952, 966-67 (Fla.2008) (citing Fla.R.App. P. 9.142(a)(6)), cert. denied, — U.S. —, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009). Sufficient evidence exists if, “after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). Although McGirth did not expressly challenge the sufficiency of the evidence as to each of his convictions, our complete review of the record demonstrates that the convictions are supported by competent, substantial evidence.
The State presented evidence that McGirth shot Diana in the chest after demanding money from her. Approximately fifteen to thirty minutes later, after briefly stepping outside to assist in removing Sheila from the house, McGirth returned to the home and shot James and then Diana in the backs of their heads. Further evidence was presented that McGirth participated in the armed robbery of Diana and James Miller: McGirth demanded money and access to credit card and banking information; his fingerprints were identified on two paper items from James’s wallet; and $259 in bloody bills was found in his possession. The evidence also established that McGirth fléd to elude the police as he led them on a high-speed vehicular chase in the Miller van and then ran from the police after the van was disabled. Accordingly, competent, substantial evidence exists to support each of McGirth’s convictions.
Guilt Phase Claims
McGirth raises two claims relating to the guilt phase of his trial. First, he contends that evidence of his drug-based relationship with Sheila Miller constituted irrelevant Williams rule evidence. Second, he claims the trial court erred in its response to a jury question concerning the law on principals. As we explain below, neither claim warrants relief.

1. Prior Bad Acts

In his first claim on appeal, McGirth argues that the trial court erred in admitting irrelevant Williams rule evidence. During the cross-examination conducted by Roberts’ defense counsel, and over McGirth’s objections, Sheila testified that her relationship with McGirth began before the criminal episode on July 21, 2006. She testified that their relationship was built around drugs and that the two bought from and sold drugs to one another. Sheila added that the two had a falling out when McGirth pulled a knife on her fiancé some time before, and that the two had not spoken until his visit to the Miller home the afternoon of the crimes. During Roberts’ case-in-chief, Sheila testified that when she and the men were in the van on the afternoon of the crimes, she was told to get on the telephone and attempt to broker a deal for several ounces of cocaine. We reject the claim that this evidence constitutes Williams rule evidence subject to the requirements of section 90.404(2), Florida Statutes (2006). We hold that the trial court did not abuse its discretion in admitting Sheila’s testimony as relevant pursuant to section 90.402, Florida Statutes (2006), to establish the context in which the charged criminal acts occurred.
An appellate court will not disturb a trial court’s determination that evidence is relevant and admissible absent an abuse of discretion. See Victorino v. State, 23 So.3d 87, 98 (Fla.2009). Relevant evidence is generally admissible unless precluded by a specific rule of exclusion. Id. (citing *787 § 90.402, Fla. Stat. (2004)). There are two categories under which evidence of uncharged crimes or bad acts will be admissible — similar fact evidence, otherwise known as Williams rule evidence, and dissimilar fact evidence. Id. (citing Zack v. State, 75B So.2d 9, 16 (Fla.2000)). The requirements and limitations of section 90.404 govern similar fact evidence while the general rule of relevancy set forth in section 90.402 governs dissimilar fact evidence. Id. at 98-99. We have explained the test for dissimilar fact evidence as follows:
[E]videnee of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because “it is a relevant and inseparable part of the act which is in issue.... [I]t is necessary to admit the evidence to adequately describe the deed.”
Griffin v. State, 639 So.2d 966, 968 (Fla.1994) (quoting Charles W. Ehrhardt, Florida Evidence, § 404.17 (1993 ed.)). We find that Sheila Miller’s testimony regarding her drug-based relationship with McGirth was not similar fact evidence, and consequently, McGirth’s claim does not constitute a true Williams rule claim. The evidence at issue — which, as explained below, established the relevant context leading up to the charged crimes — is inextricably intertwined with the defendant’s charged crimes. Consequently, the general rule of relevancy under section 90.402 governs the instant matter.
Dissimilar fact evidence of a defendant’s prior bad acts is admissible to “establish ] the relevant context in which the [charged] criminal acts occurred.” Caruso v. State, 645 So.2d 389, 394 (Fla.1994). The State may present evidence that “paints an accurate picture of the events
surrounding the crimes charged.” Victorino, 23 So.3d at 99 (quoting Griffin, 639 So.2d at 970). The evidence here helped establish how McGirth came to know Sheila, why he arrived at the Miller home the afternoon of the crimes, and why McGirth was greeted by Sheila with an embrace. Additionally, because Sheila testified that “everyone,” including McGirth, knew that her parents had retired and that they provided her with a good life, the relationship between Sheila and McGirth helped explain McGirth’s perception that Sheila’s parents were wealthy. Indeed, when McGirth insisted to Diana during the course of the robbery that she had money because she lived in The Villages, Diana turned to Sheila and asked her what she had told the men. These factors were necessary to adequately describe the events leading up to Diana’s murder. See Griffin, 639 So.2d at 968. Consequently, evidence as to the defendant’s drug-based relationship with the victims’ daughter was relevant and inextricably intertwined with the crimes charged.
We also disagree with McGirth’s contention that the evidence concerning his drug-based relationship with Sheila should have been excluded under section 90.403 because the probative value of the evidence was outweighed by its prejudicial effect. “Once the trial court has weighed the evidence to determine whether its value was more probative than prejudicial, this Court will not overturn its decision absent an abuse of discretion.” Murray v. State, 3 So.3d 1108, 1124 (Fla.), cert. denied, — U.S. —, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009). Relevant evidence is subjected to a balancing test under section 90.403, and “[o]nly when the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded.” Wright v. State, 19 So.3d 277, 296 (Fla.2009) (quoting Sexton v. State, 697 So.2d 833, 837 (Fla.1997)). Such is not the case here. Be *788 cause the evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion in admitting evidence concerning the nature of the defendant’s relationship with the victims’ daughter, Sheila. We thus deny relief on this claim.

2. Trial Court’s Response to a Jury Question

McGirth next contends that the trial court erred in its response to a question posed by the guilt phase jury during deliberations. A trial court has discretion in instructing the jury during deliberations, and an appellate court will disturb a trial court’s ruling “only when the judicial action is arbitrary, fanciful, or unreasonable.” Green v. State, 907 So.2d 489, 496 (Fla.2005) (quoting White v. State, 817 So.2d 799, 806 (Fla.2002)); see Perriman v. State, 731 So.2d 1243, 1246 (Fla.1999) (citing Fla. R.Crim. P. 3.410).
During deliberations, the jury asked whether it could have a discussion with the trial judge regarding the jury instruction on principals. The court responded that it could not engage in general discussions with the jury, but would be willing to address any specific questions the jury might have. Nine minutes later, the jury posed the following question relating to the jury instruction on principals: “Is cautious [sic] intent the same as premeditation in that it can occur a few seconds before the crime was committed?” Outside the presence of the jury, the trial judge con-suited the lawyers and observed that the standard jury instruction on principals did not define conscious intent.[8] After rejecting McGirth’s objection to providing the jury with any information beyond what is contained in the written jury instruction, the trial court answered the jury’s question as follows:
Is conscious intent the same as premeditation in that it can occur a few seconds before the crime was committed? Specifically, is conscious intent the same as premeditation?

The answer is no. The law does not fix the exact amount of time that must pass for the formation of conscious intent.

(Emphasis added.) The trial court denied defense counsels subsequent motion for mistrial.
A trial judge is not restricted to the written jury instructions when a jury poses a question during its deliberations, and may clarify a point of law for a confused jury with a brief, clear response. See Perriman, 731 So.2d at 1246-47. In the present case, the question posed to the court demonstrated the jury’s confusion about the meaning of conscious intent as it related to principals, and the trial court was well within its discretion to provide the jury with a response.
McGirth contends that the trial court defined the conscious intent element of the principal jury instruction in the same terms used to define the premeditated intent element of the first-degree murder *789 instruction, thus blurring the distinctions between the two elements.[9] We disagree and find that the trial court did not err in its response to the jury’s question on principals. Here, the trial judge correctly instructed the jury that conscious intent (an element contained in the principals instruction) and premeditation (an element contained in the first-degree premeditated murder instruction) do not share the same meaning. In addressing whether conscious intent, as set forth in the principals instruction, can occur a few seconds before the crime was committed, the judge correctly informed the jury that the law does not fix the exact amount of time that must pass for the formation of conscious intent. Because the trial court did not err in its response to the jury’s question regarding the conscious intent component of the principals jury instruction, there is no basis for relief on this claim.
Penalty Phase Claims
McGirth raises six claims relating to the penalty phase of his trial. First, McGirth challenges a remark the prosecutor made during the penalty phase closing argument. Second, he claims that the trial court erred in admitting excessive and inflammatory victim impact evidence. Third, he argues that the trial court erred in finding the avoid arrest aggravator. Fourth, he asserts that the trial court erred in finding the cold, calculated, and premeditated aggravator. Fifth, he claims that the trial court erred in finding the heinous, atrocious, or cruel aggravator. Lastly, he contends that Florida’s death penalty statute violates Ring and related cases. For reasons set forth below, we conclude that these claims do not warrant relief.

1. Prosecutorial Comments During the Penalty Phase

McGirth claims that a comment by the State during its penalty phase closing argument was improper and so prejudicial that it warrants a new penalty phase trial. We disagree.
During its penalty phase closing argument, the State addressed whether Sheila’s alleged involvement in the crimes — a theory advanced by the defense but which the State argued was not supported by the evidence — could mitigate or lessen the defendant’s culpability. The State argued that irrespective of Sheila’s involvement, lessening McGirth’s culpability would “be like giving the pilots of the two planes that crashed into the World Trade Center a pass .... a pass because it was Osama’s idea.” McGirth’s defense counsel objected to the argument and moved for mistrial.
McGirth argues on appeal that the prosecutor’s remark was improper and prejudicial because it appealed to jurors’ emotions and that the trial court erred in overruling his objections to these comments. However, we have held that “[a]ny error in prose-cutorial comments is harmless if there is no reasonable probability that those comments affected the verdict.” Hitchcock v. State, 755 So.2d 638, 643 (Fla.2000) (citing King v. State, 623 So.2d 486, 487 (Fla.1993)). In order to ensure that the harmless error test has been met, an examination of the record is required. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). This entails not only a “close examination of the permissible evidence on which the *790 jury could have legitimately relied,” but also a careful review of the “impermissible evidence which might have possibly influenced” the jury recommendation. Id. at 1135. In Anderson v. State, 18 So.3d 501 (Fla.2009), we recently explained:
In order for the prosecutor’s comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.
Id. at 518 (quoting Spencer v. State, 645 So.2d 377, 383 (Fla.1994)).
After reviewing the record, we conclude that in light of the evidence of aggravation presented against McGirth, there is no reasonable possibility that the isolated reference to the 2001 attack on the World Trade Center affected the jury’s sentencing recommendation. Error, if any, was therefore harmless.
We also conclude that the trial court did not abuse its discretion in denying defense counsel’s motion for mistrial. A motion for mistrial should be granted only where prejudicial error will vitiate the trial’s result, making a mistrial necessary to ensure that the defendant receives a fair trial. See Smith v. State, 998 So.2d 516, 526 (Fla.2008). We find that the prosecutor’s remark in the instant case was made in the context of mitigation and the isolated reference was not so prejudicial as to vitiate the trial’s result. Thus, the trial court did not abuse its discretion in denying McGirth’s request for mistrial.[10]

2. Victim Impact Evidence

McGirth next claims that the excessive and inflammatory nature of the victim impact evidence presented during the penalty phase proceeding deprived him of due process and a fair trial, and relies on general pretrial motions in limine for preservation of his claims of error. We first address the issue of preservation of any alleged error.
Before trial began, the trial court denied the defendant’s motion to limit victim impact evidence, but granted leave to file a motion in limine to address any specific issues that might arise from the deposition testimony of potential victim impact witnesses. The court also reserved ruling on McGirth’s motion requesting a proffer of victim impact testimony for a determination of whether the alleged unfair prejudice of the evidence outweighed its probative value. McGirth, however, did not raise the issue again at trial. Indeed, during the entire presentation of victim impact evidence, defense counsel did not raise any specific objections to any portion of the testimony, the introduction of the memorial advertisement purchased by neighbors and friends in Diana Miller’s honor, or any particular aspect of the photographic evidence.
It is well established that “to be cognizable on appeal, [an argument] must be the specific contention asserted as legal ground for the objection, exception, or motion below.” F.B. v. State, 852 So.2d 226, 229 (Fla.2003) (quoting Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)). Moreover, failure to contemporaneously object to improper victim impact evidence “renders the claim procedurally barred absent fundamental error.” Sexton v. State, 775 So.2d 923, 932 (Fla.2000). In this case, *791 McGirth’s pretrial motions lacked the requisite specificity to preserve a claim on appeal, and he did not obtain a definitive ruling in advance from the trial court on any specific items of victim impact evidence, which would have made a contemporaneous objection on the exclusion of evidence unnecessary. See 90.104(l)(b), Fla. Stat. (2006) (a party need not renew an objection or offer of proof to preserve a claim of error for appeal if the court has made a definitive ruling on the record admitting or excluding evidence, either at or before trial). McGirth failed to make a contemporaneous objection on specific grounds during trial. Consequently, his claim challenging the excessive and inflammatory nature of the victim impact evidence was not preserved for our review.
We nevertheless must determine whether fundamental error or a violation of due process occurred in the admission of victim impact evidence in this case. See Wheeler v. State, 4 So.3d 599, 606-07 (Fla.) (recognizing that evidence which places undue focus on victim impact, even if not objected to, can in some cases constitute a due process violation), cert. denied, — U.S. —, 130 S.Ct. 178, 175 L.Ed.2d 112 (2009). “The analysis to determine if admission of victim impact evidence has violated a defendant’s due process rights in the penalty phase of a capital trial parallels the analysis for fundamental error.” Id. at 607. During the penalty phase, error is fundamental if it is “so prejudicial as to taint the jury’s recommended sentence.” Jones v. State, 949 So.2d 1021, 1037 (Fla.2006) (quoting Fennie v. State, 855 So.2d 597, 609 (Fla.2003)).
The State may present victim impact evidence which shows “the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death.” § 921.141(7), Fla. Stat. (2006); see Wheeler, 4 So.3d at 607. However, the admissibility of victim impact evidence is not limitless. Sexton, 775 So.2d at 932. Victim impact witnesses cannot provide characterizations and opinions about the crime. Id. (citing Payne v. Tennessee, 501 U.S. 808, 826-27, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Although we recognize that in some cases unobjected-to evidence which places undue focus on victim impact can violate due process, this Court has never drawn a bright line as to the number of permissible witnesses that the State may present. See Wheeler, 4 So.3d at 607-08. We have previously found as admissible the evidence of five victim impact witnesses. Deparvine v. State, 995 So.2d 351, 378 (Fla.2008). We also found no error in the admission of victim impact testimony of twelve witnesses in Farina v. State, 801 So.2d 44, 52 (Fla.2001).
In this case, the trial court appropriately permitted Ann Tauriainen, the victim’s aunt, and Marie Franks, Lori Travis, and Lee Hancock, friends and neighbors of the victim, to testify as witnesses. The testimony of these four witnesses described the uniqueness of Diana Miller as an individual and explained how her death caused a loss to her family members and to the community. We therefore find that the nature and extent of this victim impact testimony neither constituted fundamental error nor violated due process.
We also find no error in the admission of photographs of the victim. As with victim impact testimony, we have never drawn a bright line as to the number of permissible photographs that the State may present. See Wheeler, 4 So.3d at 608. In this case, the State presented five photographs showing the victim in different settings such as with her recreational softball team in The Villages, with friends at the golf course, or by herself posing as the softball team catcher. The State also presented a *792 photograph depicting a balloon release in Diana’s memory, a photograph of a plaque and Diana’s retired softball jersey, and a copy of the quarter-page advertisement purchased in Diana’s memory. We do not find that this evidence was impermissibly prejudicial so as to warrant a new penalty phase proceeding. Therefore, we conclude that the photographic evidence neither constituted fundamental error nor violated due process. Because McGirth has not identified reversible error committed by the trial court in the admission of victim impact evidence, we deny relief on this claim.

3. Aggravating Factors

McGirth challenges the trial court’s findings of the following three aggravating circumstances: (1) the dominant motive for committing murder was to avoid arrest; (2) the murder was committed in a cold, calculated, and premeditated manner; and (3) the murder was especially heinous, atrocious, or cruel. When reviewing claims alleging error in the application of aggravating factors, this Court does not reweigh the evidence. Franklin v. State, 965 So.2d 79, 98 (Fla.2007). Rather, this Court’s role on appeal is to review the record to determine whether the trial court applied the correct rule of law for each aggravator and, if so, whether competent, substantial evidence exists to support its findings. Id. “Competent, substantial evidence is tantamount to legally sufficient evidence.” Blackwood v. State, 946 So.2d 960, 973 (Fla.2006) (quoting State v. Coney, 845 So.2d 120, 132-33 (Fla.2003)). Accordingly, we review each of the aggravators raised on appeal for competent, substantial evidence.[11]
A. Avoid Arrest Aggravator
McGirth argues that the trial court erred in instructing the jury on and in finding the avoid arrest aggravating factor. We conclude that the trial court did not err.
The focus of the avoid arrest aggravator centers on the motivation for the crimes. See Jennings v. State, 718 So.2d 144, 151 (Fla.1998). “[T]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Reynolds v. State, 934 So.2d 1128, 1156 (Fla.2006) (quoting Bell v. State, 841 So.2d 329, 336 (Fla.2002)). “However, ‘[e]ven without direct evidence of the offender’s thought processes, the arrest avoidance factor can be supported by circumstantial evidence through inference from the facts shown.’ ” Id. at 1157 (quoting Swafford v. State, 533 So.2d 270, 276 n. 6 (Fla.1988)). When evaluating the avoid arrest aggravator, this Court has considered “whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the *793 defendant.” Nelson v. State, 850 So.2d 514, 526 (Fla.2003) (quoting Farina, 801 So.2d at 54).
In this case, McGirth never made an effort to conceal his identity from his victims. McGirth instructed Houston, his co-defendant, to pick up shell casings and wipe objects down to remove any fingerprints from items touched while in the home. Police had to unlock the front door from the inside of the home to allow emergency medical personnel inside. While trying to flee from police in the van, McGirth ordered Houston to shoot Sheila, the victims’ daughter, because she could identify them. The evidence indicates that McGirth probably could have accomplished the robbery of the Miller home without killing Diana or attempting to kill James. Diana posed no resistance to McGirth or his codefendants as she was virtually immobilized after being shot once in the chest. James also did not offer any resistance toward McGirth or the other code-fendants as he had been pinned to the floor. McGirth easily obtained access to the Miller’s van and their property. Once McGirth and his codefendants obtained the victims’ property and secured a getaway, there was no reason to kill Diana and attempt to kill James except to eliminate them both as witnesses. See Looney v. State, 803 So.2d 656, 677-78 (Fla.2001) (finding that once the defendants immobilized the victims, obtained their property, and secured a getaway, there was no reason to kill the victims except to eliminate them as witnesses). Competent, substantial evidence supports the trial court’s finding of the avoid arrest aggravating factor.
B. Cold, Calculated, and Premeditated Aggravator
McGirth next argues that the trial court erred in instructing the jury on and in finding the cold, calculated, and premeditated (CCP) aggravator. He challenges the presence of certain elements of CCP and claims that the trial court’s finding is not supported by competent, substantial evidence. We disagree and conclude that the trial court did not err.
A court must consider the totality of the circumstances when determining whether a murder was committed in a cold, calculated, and premeditated manner. Gill v. State, 14 So.3d 946, 962 (Fla.2009) (citing Hudson v. State, 992 So.2d 96, 116 (Fla.2008), and Lynch v. State, 841 So.2d 362, 372 (Fla.2003)). For a trial court’s finding on CCP to be legally sufficient, the evidence must show that “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.” Franklin, 965 So.2d at 98 (citing Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). The focus of the. CCP aggra-vator centers on the manner in which the defendant executed the crime. Walker v. State, 957 So.2d 560, 581 (Fla.2007). Legally sufficient evidence exists to support a trial court’s finding on CCP where the defendant procures a weapon in advance, receives no provocation or resistance from the victim, and carries out the killing as a matter of course. See Farina, 801 So.2d at 54. .
In this case, the State presented evidence that McGirth armed himself in advance of his arrival at the entrance to The Villages, a gated, residential neighborhood. He and his codefendants then drove about thirteen minutes before finally arriving at the Miller home. He shot Diana once in the chest, obtained the victims’ property and access to their vehicle, left the house, *794 and returned to shoot both James and Diana in the back of the head. There was no indication that McGirth received provocation or resistance from Diana Miller. McGirth had ample time to reflect upon his actions before deciding to shoot Diana execution-style, and the evidence clearly established that the murder was “cold.” See Lynch, 841 So.2d at 372 (holding that the “cold” element is legally sufficient where the defendant had ample opportunity to calmly reflect upon his actions, following which he decided to shoot his victims execution-style).
Additionally, legally sufficient evidence exists to support a finding of the “calculated” element. McGirth armed himself in advance, killed Diana execution-style, and had time to coldly and calmly decide to kill. Id. It is significant to note here that as many as thirty minutes passed between the time Diana was first shot in the chest and then fatally wounded from a gunshot to the back of her head. Id. (citing Hertz v. State, 803 So.2d 629, 650 (Fla.2001)). Competent, substantial evidence also supports the element of heightened premeditation as it was demonstrated that McGirth had ample opportunity to leave the crime scene and not commit the murder; nevertheless, he returned to the home to shoot Diana Miller in the back of the head. Id. at 373. Lastly, the evidence in this case showed no pretense of legal or moral justification for the killing. Because legally sufficient evidence exists to support a finding of each element of CCP, we conclude that the trial court did not err in finding this aggravator. Accordingly, we deny relief on this claim.
C. Heinous, Atrocious, or Cruel Aggravator
McGirth also argues that the trial court erred in instructing the jury on and in finding the heinous, atrocious, or cruel (HAC) aggravator. He contends that when he first shot Diana in the chest, he did so in response to her resistance rather than for purposes of inflicting suffering and that, consequently, the aggravator is unsupported by the evidence. We conclude that the trial court did not err.
The focus of the HAC aggra-vator centers on the means and manner in which the death is inflicted upon the victim and the victim’s perceptions of the surrounding circumstances. See Victorino, 23 So.3d at 104; Schoenwetter v. State, 931 So.2d 857, 874 (Fla.2006). The aggravator is applicable where the murder is “both conscienceless or pitiless and unnecessarily torturous to the victim.” Victorino, 23 So.3d at 104 (emphasis omitted) (quoting Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992)). The HAC aggravator is “proper only in torturous murders — those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.” Rimmer v. State, 825 So.2d 304, 329 (Fla.2002) (emphasis omitted) (quoting Shere v. State, 579 So.2d 86, 95 (Fla.1991)).
McGirth contends that the fact that there were multiple gunshot wounds inflicted upon Diana and that Diana begged for her life is insufficient to support a HAC finding absent evidence that McGirth intended to cause the victim unnecessary and prolonged suffering. However, as the State correctly notes, the killer’s intention to inflict pain on the victim is not a necessary element of HAC. Ocha v. State, 826 So.2d 956, 963-64 (Fla.2002). The killer need not intend to inflict torture where the victim is killed in a torturous manner because “the very torturous manner of the victim’s death is evidence of a defendant’s indifference.” Victorino, 23 So.3d at 104 (quoting Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002)); see also Schoenwetter, *795 981 So.2d at 874 (noting that the focus on the HAC analysis is not on the intent of the killer but rather on the victim’s actual suffering).
The HAC aggravator generally does not apply to execution-style killings unless the State presents additional evidence that the defendant acted to physically or mentally torture the victim. See Victorino, 23 So.3d at 104-05; see also Rimmer, 825 So.2d at 327. However, “fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” Hudson, 992 So.2d at 115 (quoting James v. State, 695 So.2d 1229, 1235 (Fla.1997)). This includes instances “where the victim is acutely aware of his or her impending death.” Id. (citing Gore v. State, 706 So.2d 1328, 1335 (Fla.1997)).
McGirth cites to Rimmer, 825 So.2d 304, to support his contention that the evidence in this case is insufficient to support the trial court’s finding of HAC. In Rimmer, we found the record devoid of any evidence that the defendant engaged in some action to torture the victims or subject them to pain and prolonged suffering. Id. at 328. We concluded that the fact that the defendant forced his victims to lie on the floor with their hands bound behind their backs while he robbed the store they worked in was insufficient to show that the victims knew they would be killed or that they lay in fear of their impending deaths. Id. (citing Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996)) (“Speculation that the victim may have realized that the defendants intended more than a robbery when forcing the victim to drive to the field is insufficient to support this aggravating factor.”). We held in Rimmer that while the victims experienced fear, it was not the type of fear, pain, and prolonged suffering that sufficiently supports an HAC finding. Id.
The present case is factually distinguishable from Rimmer. Here, McGirth shot Diana once in the chest and ignored her pleas for help. She knew the men had taken her daughter hostage and that they had her husband. When Diana asked for water and mentioned that she was cold, Houston, McGirth’s codefendant, provided her with some water and wrapped her body with a blanket for warmth. McGirth responded to these gestures with a derogatory comment suggesting weakness on Houston’s part. Diana crawled back to her daughter’s room and lay near her husband James on the floor when he was shot in the back of his head. The evidence upon which the trial court relied establishes that Diana knew of her impending death for some time before her murder.
Any suggestion on McGirth’s part that the murder lacked any element of mental or physical torture is belied by this evidence. The medical examiner testified that the first bullet passed through Diana’s sternum and lung. About fifteen to thirty minutes passed from the time Diana was first shot in the chest until the time when she was fatally shot in the back of her head. Diana undoubtedly experienced pain and remained conscious and cognizant of her surrounding circumstances. The evidence showed that Diana’s lung was collapsing and she experienced increasing difficulty in breathing. As her condition deteriorated, she likely experienced anxiety. Once McGirth obtained access to credit card information, jewelry, and the Miller van, he shot James and then Diana in the back of the head. Diana’s murder was both conscienceless or pitiless and unnecessarily torturous, and McGirth exhibited utter indifference to the torturous manner of Diana’s death. We thus conclude that competent, substantial evidence sup *796 ports the trial court’s finding of the HAC aggravator.
Apprendi and Ring Claims
Finally, McGirth argues that Florida’s capital sentencing scheme, section 921.141, Florida Statutes, violates his federal constitutional rights to due process and a fair jury trial. He also contends that the capital sentencing scheme is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it does not require the findings of each aggravating circumstance to be made by a unanimous jury. These claims are without merit.
This Court has addressed whether Florida’s capital sentencing scheme violates the federal constitution under Apprendi and Ring and has denied relief. See Gore v. State, 964 So.2d 1257, 1276-77 (Fla.2007). We have also rejected claims that aggrava-tors must be individually found by a unanimous jury. See Zack v. State, 911 So.2d 1190, 1202 (Fla.2005) (citing Hodges v. State, 885 So.2d 338, 359 n. 9 (Fla.2004)). Additionally, this Court has repeatedly rejected Ring claims where the trial court has found the “during the course of a felony” aggravator and the “prior violent felony” aggravator. Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004) (“This Court has held that the aggravators of murder committed ‘during the course of a felony and prior violent felony involve facts that were already submitted to a jury during trial and, hence, are in compliance with Ring.”). Given that McGirth was convicted of the contemporaneous attempted first-degree murder of James and robbery with a firearm, we deny relief on this claim.
PROPORTIONALITY
McGirth does not challenge the proportionality of his death sentence. We nevertheless conduct a proportionality review to guard against “the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Wright, 19 So.3d at 303. In reviewing a death sentence for proportionality, we ensure that the death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996). Our review on proportionality is not a comparison between the number of aggravators and mitigators. See Barnes v. State, 29 So.3d 1010, 1028 (Fla.2010), cert. denied, — U.S. —, 131 S.Ct. 234, 178 L.Ed.2d 155 (2010). Instead, we engage in a qualitative review of the totality of the circumstances and compare the present case with other capital cases. Wright, 19 So.3d at 303.
In this case, the jury recommended a sentence of death by a vote of eleven to one and the trial court so sentenced McGirth. We conclude that the five aggravating factors, weighed against the statutory and nonstatutory mitigating factors, amply support the imposition of the death sentence. We have previously upheld the death penalty as proportionate in cases involving similar charges and similar aggravation. For example, in Buzia v. State, 926 So.2d 1203 (Fla.2006), involving a first-degree murder and an attempted first-degree murder, we affirmed the death sentence where the trial court found and assigned great weight to four aggrava-tors — prior violent felony, avoid arrest, HAC, and CCP — and found several non-statutory mitigating factors. Id. at 1216. We have also upheld the death sentence in cases where the defendant’s age constituted a statutory mitigating circumstance. See Muehleman v. State, 3 So.3d 1149, 1166-67 (Fla.2009) (upholding the death sentence for a defendant who was eighteen *797 at the time of the murder where the trial court found five aggravators including avoid arrest, HAC, and CCP). We thus conclude that the death sentence in this case is proportionate.
CONCLUSION
After reviewing the issues raised on appeal and conducting our own independent review of the sufficiency of the evidence and the proportionality of the death sentence, we affirm'McGirth’s convictions for first-degree murder, attempted first-degree murder with a firearm, robbery with a firearm, and fleeing or eluding a law enforcement officer and the sentences imposed for these offenses.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which QUINCE, J., concurs.

. Sheila’s dependence on her parents had often proven to be a source of contention between her parents as her father opposed supporting her. Sheila had battled drug and alcohol abuse since her teenage years and had been convicted of possession of cocaine and for uttering false or worthless checks. She had stolen from her parents and at one point stole her mother's identity to obtain a credit card. Sheila's relationship with her parents deteriorated to the point that her father obtained an injunction against her.

. Sheila testified that she and McGirth were former friends who had a falling out, and that the two had not spoken until that day.

. Precision Immobilization Technique.

. Both Sheila and Houston testified against McGirth and Roberts, who were tried jointly. McGirth and Roberts were both charged with, but acquitted of, the kidnapping with a firearm of Sheila. An undercurrent throughout the case was the extent, if any, of Sheila Miller's involvement in the criminal acts that transpired on July 21, 2006. Roberts, who was twenty years old at the time of the crimes, was convicted of robbery with a firearm and the lesser included offenses of manslaughter and attempted voluntary manslaughter.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court found McGirth’s IQ of 98 was "not a mitigating factor,” and assigned it no weight. The trial court did not find that letters requesting that mercy be showed to McGirth were a nonstatutory mitigating factor. However, the court stated that even if a request for mercy were a nonstatutory miti-gator, very slight weight would be given. The trial court rejected the proposed nonstatutory mitigator that McGirth acted under the influence and domination of another.

. Williams v. State, 110 So.2d 654 (Fla.1959).

. The standard jury instruction on principals reads:
If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated' as if he had done all the things the other person or persons did if:
1. the defendant had a conscious intent that the criminal act be done and
2. the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.
To be a principal, the defendant does not have to be present when the crime is committed or attempted.
Fla. Std. Jury Instr. (Crim.) 3.5(a).

. McGirth also argues that the State’s de-emphasis on the reflection time for premeditation during its guilt phase closing argument further confounded the jury’s understanding of the jury instructions. We disagree and find that the State’s closing argument fell within the confines of proper closing argument. See Breedlove v. State, 413 So.2d 1, 8 (Fla.1982) (holding that counsel may advance all legitimate arguments during closing argument and that logical inferences may be drawn from those arguments).

. Although we find that the prosecutor's remark does not warrant relief in this case, we nevertheless caution prosecutors not to exceed the proper scope of argument.

. McGirth also challenges the propriety of the trial judge’s decision to instruct the jury on each of the aggravators challenged on appeal. We have held that where competent, substantial evidence supports the trial judge's decision to do so, it is not error to instruct the jury on the respective aggravator. See Aguirre-Jarquin v. State, 9 So.3d 593, 607 (Fla.2009), cert. denied, — U.S. —, 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010). Further, when evidence on a mitigator or aggravator has been presented to the jury, the court is required to instruct the jury on the factor. Bowden v. State, 588 So.2d 225, 231 (Fla.1991). Because, as explained below, there was competent, substantial evidence presented on each of the aggravators challenged on appeal, the trial court did not err in instructing the jury on each of the aggravators.