# Supreme Court of Florida

—————————

No. SC15-625
—————————

**DWAYNE F. WHITE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 30, 2017]

PER CURIAM.

Dwayne F. White, who was forty-one years old at the time of the offense, was convicted of first-degree murder in the death of his estranged wife, Sarah Yvonne Rucker, who was forty-three years old at the time of her death. By a vote of eight to four, the jury recommended that White be sentenced to death, and the trial court imposed a death sentence. This is White's direct appeal of his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

For the reasons that follow, we affirm White's conviction of first-degree murder but vacate his death sentence because we cannot conclude that the Hurst v.

State (Hurst), 202 So. 3d 40 (Fla. 2016), error is harmless beyond a reasonable doubt. Accordingly, we remand his case to the circuit court for a new penalty phase.

**FACTS**

The evidence introduced at trial during the guilt phase established the following facts. Dwayne Fitzgerald White and the victim, Sarah Yvonne Rucker, had been involved in a romantic relationship since 1988. Although White and the victim were married at the time of the murder, they had become estranged and lived in separate houses. White lived in Orlando, Florida, with his girlfriend of eight years. The victim lived in a house she owned with White in Deltona, Florida, with their four children.

At approximately two a.m. on August 29, 2011, White unexpectedly arrived at the victim's home. Dwayne White, Jr. ("Dwayne"), the couple's eldest son, who was approximately seventeen years old at the time of the incident, awoke to the sound of the dog barking and went to the window, where he saw his father, White, walking up the driveway.

Dwayne called to his mother to alert her that White was outside, but White walked into the house and told Dwayne he wanted to speak with him. White spoke with Dwayne in his room for a few minutes while the victim went outside.

At the end of the conversation with White, Dwayne stayed in his room while White walked outside to see the victim. Dwayne then heard his younger sister yelling for him. Dwayne went outside in response and observed a beer bottle flying toward the victim. He saw the victim on her back, with her hands up holding her cell phone, and White attempting to pry her phone from her hands. White eventually was able to take the phone and then got in his car and drove away. Dwayne had to restrain his mother from going after White as he left with her phone.

Throughout the altercation the victim was on the phone with an emergency dispatcher, who was reached by dialing 911. She made five calls to 911 between 1:56 and 2:01 a.m. A recording of the calls was entered into evidence and played for the jury at trial. The victim can be heard on the calls telling White: "Don't hit Dwayne, stop the violence. You are so violent. Stop. Just stop." She also stated: "He scared me. I'm tired of this. He is always doing this. . . . I just need to get my phone back."

The victim told the 911 operator that White came over to the house that night because he was mad that the victim was no longer romantically interested in him. At one point, the victim told the operator: "I'm going to have to get me a gun and blow his head off for coming into my yard." She continually emphasized how badly she needed to get her phone back and how important it was to her, even

stating at one point, "I'm going to go find him myself." She told the operator that it was critical that she have her phone because she worked at a surgical center and was on call that night. She could be called in at a moment's notice and could be fired if she did not have her phone. The victim told the 911 operator this was not the first time this had happened. White had stolen two other phones from her and gone through all of her phone calls and text messages.

Dwayne also saw White's pocket knife, which he often carried with him, clipped to his pants pocket that night. After White left, Dwayne left the house intending to go down the street to his neighbor's house to get a shotgun for protection in the event that White might return. Dwayne did not make it, however, as the victim went after him and was able to bring him home. Shortly thereafter, the police arrived at the victim's residence. White called Dwayne's phone while the police were there. Dwayne handed the phone to the officer, who intended to convince White to come back to the victim's house and return her phone; however, White immediately hung up.

After the police left, White called Dwayne's phone again. When Dwayne answered the phone, White told him to go in to the bathroom by himself. White then told Dwayne that it was not Dwayne's place to be involved in his parents' business. White told Dwayne that he needed the victim to take back her report of the crime. At that point, the victim came into the bathroom, snatched Dwayne's

phone, and began yelling at White that she needed her phone back. The victim then walked out the front door with Dwayne's phone, and that was the last time Dwayne saw his mother alive.

The evidence is unclear as to exactly what transpired between 2:30 a.m., when White left the victim's house, and approximately four a.m., when her body was found outside of a Miami Subs near the intersection of Interstate 4 and exit 434 in Orlando. However, the State introduced evidence indicating the relative locations of White's phone, the victim's phone, and Dwayne's phone during that time.

Cell phone records indicate that White's phone and the victim's phone, which White had in his possession, were tracked from the victim's home in Deltona to the vicinity of White's girlfriend's home in Orlando, reaching that location sometime around 2:47 a.m. At 3:32 a.m., White received a call from Dwayne's phone, which was in the victim's possession, that lasted approximately nine minutes. By the end of this call, White's phone was tracked from his girlfriend's house toward the location of where the victim's body was found. By 3:46 a.m. White's phone was in the vicinity of the cell phone tower serving the Miami Subs where the victim's body was found. Dwayne's phone was also in the vicinity of the cell phone tower serving the Miami Subs location at 3:46 a.m. At 3:52 a.m., Dwayne's phone received a five-second call from White's phone. The

victim's car was first spotted in the Miami Subs parking lot by a passerby at approximately 4:10 a.m.

The victim's body was discovered outside of the Miami Subs location between four a.m. and five a.m. by two men meeting there to carpool to work. Her car was located at the scene, parked, with one door left open. The men called 911, and the Seminole County Sheriff's Office crime scene analysts reported to the scene. The victim was found lying face down on the ground in a pool of her own blood. White's palm print was found in the victim's blood just above the victim's head on an exterior window ledge of the Miami Subs.

The victim had been stabbed seven times around her upper chin and neck. Her throat had also been cut so deeply that her trachea, esophagus, and carotid artery had been completely severed. The medical examiner testified that it would have taken at least four separate passes with a knife or similar object to create such a "gaping wound." The victim's body also had several defensive wounds to the palms of her left and right hands, indicating that some sort of struggle had taken place that morning. The medical examiner determined the victim's manner of death to be homicide and cause of death to be sharp-force injuries to the neck.

Later that day, the police first made contact with White. When White was informed that Sarah Rucker had been involved in an "incident" and was "deceased," his immediate reaction was: "It wasn't me."

Detective Jennifer Spears testified that when she entered White's home to question him about the victim's death, she saw a bottle of household bleach on the bathroom counter and smelled the strong odor of bleach coming from the bathtub itself. She also observed some red scratches on White's chest, which she described during the trial as consistent with fingernail scratches. When questioned about his pocket knives that he was known to carry with him, White told Spears that they would either be in his bedroom or in his van. However, after a thorough search, the knives were never located.

Investigator William Maxwell transported White from his girlfriend's house in Orlando to the Volusia County Sheriff's Office for questioning. Maxwell testified that on the way there, when driving by the location of the crime scene, White hung his head low and appeared to be in distress, stating he had a lot on his mind. A video recording of White's interview with the Volusia County Sheriff's Department was played during trial for the jury. He consistently denied having any involvement in the crime or being at the crime scene, even when confronted with evidence that his palm print was found at the scene in the victim's blood.

White took the stand at his trial. He admitted that he had five previous felony convictions. He claimed that he went to the victim's house that morning with the intention of speaking with his son, not of causing a fight. When White went outside, he got into a scuffle with the victim and she lost her footing and fell

to the ground. When the victim was on the ground, he grabbed her phone and then left. Though he had a bottle of beer in his possession and had been drinking that night, he stated he did not throw a beer bottle at the victim. When White left the victim's home, he went to his girlfriend's home in Orlando. He spoke with the victim on his way back and she seemed angry and irritated with him. They had planned to meet at the Miami Subs location so he could return her phone. Before they met, White looked through the victim's phone and saw that she had been having romantic relationships and "angry conversations" with a variety of men through text messaging. When he got to the Miami Subs location, he found the victim's body in front of the store and saw a lot of blood. White testified that he went to the location with the intention only of returning her phone and testified that he did not have any intention to harm or get in a fight with the victim, as evidenced, he claimed, by the fact that he did not bring a weapon with him. When he saw the victim's body, he went to her and yelled her name trying to elicit a response. When he realized she was dead, he panicked and then left and went back home. White did not call the police or tell the detectives during his interview about discovering the victim's body or being present at the crime scene because he did not trust them and knew he would be the prime suspect in the case. The jury found the defendant guilty of first-degree murder.

At the penalty phase, the State presented four witnesses: fingerprint analyst Jerri Cabral; medical examiner Marie Herrmann; Investigator Don Maxwell; and victim advocate Pam Theiss. The fingerprint analyst testified that the fingerprints she obtained from White matched fingerprints on three certified prior violent felony convictions. The medical examiner testified again during the penalty phase of the trial, adding to her previous testimony information regarding the victim's physical and emotional pain, consciousness during the attack, and defensive wounds. The medical examiner testified that the victim had a total of five defensive wounds on her hands. She also testified that the victim would have experienced extreme emotional and physical pain and could have been conscious for up to sixty seconds after she was first attacked. The investigator, Don Maxwell, testified that he had reported to the victim's home in February of 2011, after she had gotten into an altercation with White. White was charged with felony battery and domestic violent strangulation following the February 2011 incident. Finally, the victim advocate read a victim impact statement written by the victim's and White's eldest daughter, Kiara Rucker.

The defense presented three witnesses: White's brother, Lee White, his sister Felicia White, and a close family friend and counselor, Richard Danner. White's family testified that he had a great personality, was a comedian, played instruments in middle school, was involved in the Police Explorers, and loved and spent time

with his children. White's sister testified that their father was absent in their lives, though they knew who he was. White's brother testified that their mother was strict and used corporal punishment. The defense also introduced family photos of White growing up. Richard Danner testified that he had known White for a long time. He had counseled White and convinced him to marry the victim. White often helped Danner counsel young men to keep them from going down the same path taken by White. Danner also testified that White loved his children very much and was very involved in their lives. The State questioned Danner regarding White's three previous felony convictions: a 1988 aggravated assault conviction, in which White pulled a shotgun on a woman in a laundry room; a 1992 aggravated assault conviction, in which White pulled a gun on a roommate over an argument; and a 1993 aggravated battery conviction, in which White hit the victim in this case, Sarah Rucker, over the head with a bottle while she was pregnant with her and White's eldest son.

The trial court instructed the jury on three aggravating factors: (1) that White had a prior violent felony; (2) that the murder was especially heinous, atrocious, or cruel (HAC); (3) and that White committed the murder to avoid arrest. Additionally, the trial court instructed the jury on two statutory mitigating circumstances: (1) extreme emotional disturbance; and (2) other factors in the defendant's background that would mitigate against imposition of the death

- 10 -

penalty, and seven nonstatutory mitigating circumstances based on White's character, background, life, and other circumstances of the offense. The jury recommended death by a vote of eight to four.

At the Spencer[1] hearing, which took place on January 6, 2015, White waived his right to present any new evidence and to make a statement. The State also did not present additional evidence.

In sentencing White, the trial court found two of the three aggravating factors on which it instructed the jury: (1) the crime was committed by a person previously convicted of a prior violent felony (great weight); and (2) the murder was especially heinous, atrocious, or cruel (great weight). The trial court noted in particular that White's prior violent felonies were three separate events, one of which involved the victim in this case, and one of which the evidence showed that but for the intervention of White's brother, he would have shot that victim. The trial court found that the State failed to prove that the murder was committed for the purpose of avoiding arrest, and therefore gave that aggravating factor no weight.

The trial court rejected the statutory mitigating circumstance that the crime was committed while the defendant was under the influence of extreme emotional

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

or mental disturbance. However, the court did find the nonstatutory mitigating circumstance of mental or emotional disturbance, but did not deem the emotional disturbance "extreme," and gave it little weight. The trial court found that the statutory mitigating circumstance that there were other factors in the defendant's background that would mitigate against imposition of the death penalty was proven and gave it little weight.

In addition, the trial court found that White had proven the following non-statutory mitigating circumstances and gave each little weight: (1) the defendant was abandoned at an early age by his father; (2) the defendant grew up without his father and was raised by his mother; (3) the defendant was a good student and member of the Police Explorers; (4) the defendant has family and friends who care for him and love him; (5) the defendant participated in the lives of his children; (6) the defendant helped to counsel young men; (7) the defendant manifested appropriate courtroom behavior throughout the pendency of the penalty and guilt phases of the trial. The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced White to death.

## ANALYSIS

White's counsel raises four claims on appeal: (1) White's sentence of death should be reversed based on Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616

(2016); (2) the State presented insufficient evidence to support his conviction; (3) the HAC jury instruction is unconstitutional; and (4) White's sentence of death is disproportionate. We address the sufficiency of the evidence and then address White's claim under Hurst v. Florida.[2] Because we conclude that White's sentence should be reversed under Hurst, we do not address the other penalty phase arguments.

## I. Sufficiency of the Evidence

White argues that the evidence presented by the State was insufficient to support his first-degree murder conviction. "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). Here, where the evidence presented by the State is wholly circumstantial, the Court "must determine not only whether the State has proven the 'elements of the crime beyond a reasonable doubt,' but also whether the record contains 'competent substantial evidence which is inconsistent with the defendant's theory of events.' "

---

2. White filed numerous pretrial motions, including one to declare Florida's death penalty unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584 (2002).

Hodgkins v. State, 175 So. 3d 741, 751 (Fla. 2015) (quoting Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003)).

White argues the State did not present a single piece of evidence that clearly negates White's hypothesis of innocence that someone else committed the crime and that he merely found the victim after she was already deceased. He asserts that this case is analogous to Hodgkins, where the Court reversed Hodgkins' murder conviction when the circumstantial evidence of Hodgkins' DNA being under the victim's fingernails was insufficient to overcome Hodgkins' reasonable hypothesis of innocence that someone else killed the victim. 175 So. 3d at 750. The defense's theory of events is that White was at the murder scene, but, as he testified at trial, only after the victim was already deceased. White fled and did not call the police because he knew he would be the prime suspect and did not trust the police. White testified that when he stole the victim's phone, he saw "angry conversations" with other men she had been dating, and the defense offered the theory that perhaps when the victim left her house that morning she was going to meet another man, who killed her.

The State has produced competent, substantial evidence that is inconsistent with White's theory of events. The State presented evidence that White went to the victim's home around two a.m. on the date of the offense. At her home, White got in an altercation with the victim and stole her cell phone. The victim left the

- 14 -

home with her son's phone, traveling towards White's residence in Orlando, after emphasizing to the 911 operator how important it was that she have her phone and that she needed to get it back. Around three a.m., White spoke with the victim in a call that lasted more than nine minutes and then began traveling towards the Miami Subs location, which would ultimately be the crime scene. Further, White admitted to being at the crime scene. White's palm print was found in the victim's blood on a window sill directly above the victim's head. White always carried a pocket knife with him, which the police could not find after arresting him. Upon entering White's home to interview him, a female detective noticed a bottle of bleach on the counter in the bathroom and smelled the odor of bleach coming from the bathroom. White consistently denied being at the crime scene to police during his interview, and did not admit he was there until trial. Finally, White and the victim had a history of violence in their relationship.

Taken together, this circumstantial evidence rebuts White's presumption that the victim was murdered by an angry lover. There was simply no evidence adduced at trial, other than White's testimony, that he saw "angry conversations" on the victim's phone that would tend to corroborate White's theory of the murder. By contrast, the State presented, as White characterizes it, a "large volume" of circumstantial evidence that points to White as the murderer, and in doing so, rebuts his theory. The relationship between White and the victim, the history of

violence, the altercation within hours of the victim's death, and the cell phone records showing calls between White and the victim just minutes before her death all indicate that it was White, and not some other angry lover, who murdered the victim.

Hodgkins is distinguishable from this case. In Hodgkins, this Court found that the evidence under the victim's fingernails pointed only to the fact that the defendant had been with the victim at some point before she was murdered. 175 So. 3d at 748. There was, however, no other evidence to put the defendant at the crime scene around the time of victim's death or any evidence of animosity between the defendant and the victim. Id. at 748-49. By contrast, in this case, there was a pattern of previous violence between White and the victim. Further, White admits to being at the crime scene in close proximity to the time when the victim was killed, which is supported by the fact that his palm print was found in her blood directly above her head. Thus, this case is distinguishable from the facts in Hodgkins.

## II. **Hurst v. Florida** and **Hurst**

The next issue addressed is whether White is entitled to Hurst relief. New rules of law announced by this Court or the United States Supreme Court generally apply to all cases that are pending on direct review or are otherwise not final. State v. Johnson, 122 So. 3d 856, 861 (Fla. 2013) (citing Griffith v. Kentucky, 479 U.S.

314, 328 (1987); Smith v. State, 598 So. 2d 1063, 1066 (Fla. 1992)).  Therefore, Hurst applies to this case, which is before this Court on direct appeal.

White filed a pretrial motion seeking relief based on Ring, which the trial court denied.  He now argues that his death sentence was imposed in violation of Hurst v. Florida, and, as a result, his death sentence must be commuted to a life sentence pursuant to section 775.082(2), Florida Statutes (2011).  Alternatively, White argues that he must be sentenced to life imprisonment because Hurst v. Florida error is structural and therefore not amenable to harmless error review.  The State argues that no error occurred at all in this case, but if it did, it was harmless.

In Hurst, this Court determined that, in order for the trial court to constitutionally impose a sentence of death, the jury must unanimously find all facts necessary to impose a sentence of death and unanimously recommend a sentence of death.  Hurst, 202 So. 3d at 44.  Thus, there is no question whether there was Hurst error in White's case because the jury issued only an advisory recommendation of death by a vote of eight to four and did not make any of the factual findings required by this Court in Hurst.  Accordingly, the issue before this Court is whether the Hurst error in White's case was harmless.  On remand, in Hurst, we held that Hurst error is capable of harmless error review.  Id. at 66.  As applied to the right to a jury trial, it must be clear beyond a reasonable doubt that

the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to White's death sentence.  See id. at 65-67.

We cannot conclude that the Hurst error in White's case was harmless beyond a reasonable doubt.  The jury in this case did not make any of the requisite factual findings and recommended death by only a vote of eight to four.  Additionally, it should be noted that even though White had three prior violent felony convictions, all of these convictions were between 18 and 24 years prior to the date of the offense in this case.  White was 18, 22, and 23 years old, respectively, when he committed the previous crimes, and the prior felonies involved three separate incidents.  Although we can conclude that the prior violent felony aggravating factor was found unanimously, this Court has no way of knowing if the jury unanimously found HAC, whether the aggravating factors were sufficient to impose death, or whether the aggravating factors outweighed the mitigating circumstances.  Also of significance in this case is that the trial court submitted the avoid arrest aggravator to the jury but then did not "find" that the aggravator was proven and therefore did not consider it, so there is no way of knowing if the jury found that aggravator because there was no special verdict form.

Simply put, any attempt by this Court to determine why four jurors voted for life and eight jurors voted for death is mere speculation without more information

and certainly does not rise to the level of proof beyond a reasonable doubt. For these reasons, we conclude that the Hurst error in this case was not harmless beyond a reasonable doubt and, therefore, White's case should be remanded for a new penalty phase.

## CONCLUSION

Accordingly, we affirm White's first-degree murder conviction but vacate his sentence of death and remand the case to the circuit court for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Seminole County,
    Kenneth Russell Lester, Judge - Case No. 592011CF004012A000XX

James S. Purdy, Public Defender, and John M. Selden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Vivian Singleton, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee