# Supreme Court of Florida

———————

No. SC16-808

———————

**VAHTIECE ALFONZO KIRKMAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 11, 2018]

PER CURIAM.

Vahtiece Alfonzo Kirkman appeals his conviction and sentence of death for the first-degree murder of Darice Knowles. The trial judge sentenced Kirkman to death for the first-degree murder conviction after a jury recommended the death penalty by a vote of ten to two. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm Kirkman's conviction, but we vacate the death sentence and remand for a new penalty phase based on the United States Supreme Court's opinion in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and this Court's opinion on remand in Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017).

## FACTS AND PROCEDURAL HISTORY

On July 30, 2010, approximately four years after first being made aware of her murder, the Cocoa Police Department found the skeletonized remains of Darice Knowles, a Bahamian citizen, in a heavily wooded and swampy area in Cocoa, Florida. The examination of Darice's remains revealed that her hands and feet had been bound with duct tape, her mouth had been covered with duct tape, and she had been buried alive by being covered with concrete and dirt.

Cocoa police were led to the burial site a few days earlier by Christopher "Dread" Pratt, who had been Darice's on-again, off-again boyfriend. Pratt, also a Bahamian citizen, led police to the burial site as part of a plea agreement he entered into while awaiting trial for his involvement in the separate murder of Willie Parker. For the Parker murder, Pratt had been indicted years before—in October 2006—along with Kirkman and a third individual, Jonathan Page.

Under the plea agreement, Pratt would receive a ten-year sentence for the second-degree murder of Parker, as well as a ten-year sentence for the second-degree murder of Darice, followed by ten years of probation. The plea agreement was conditioned on Pratt showing the police where Darice's body could be located and on Pratt testifying truthfully against Kirkman in both murder cases. Pratt led the investigators to the burial area, and on the fifth day of searching, Darice's remains were found.

On January 23, 2012, Kirkman was indicted for the first-degree premeditated murder of Darice Knowles. At trial, Pratt testified that on March 17, 2006, he (Pratt) bound Darice's hands and feet, taped her mouth, dug a hole, and buried her alive in a shallow grave in a swampy area off of a dirt road in Cocoa by covering her with cement[1] and dirt. Pratt explained that he did so all at the direction of, and while in the presence of, Kirkman. Pratt also explained that Kirkman wanted Darice dead because she had spent the previous night with a police officer, and Kirkman was concerned she was talking to the police about his criminal conduct. Pratt further explained that the shovel, cement, and duct tape used in the murder were all supplied by Kirkman and that Kirkman drove Pratt and Darice around in Pratt's rented minivan for approximately thirty to forty minutes until Kirkman selected the burial location.

On April 8, 2016, the jury convicted Kirkman of first-degree murder. On April 12, 2016, the jury, by a vote of ten to two, recommended a death sentence. On April 29, 2016, the trial court sentenced Kirkman to death.

## Guilt Phase

The evidence presented at the guilt phase primarily consisted of the following: codefendant Pratt's testimony; the testimony of Jovonnie Freeman, the

---

1. Although we recognize there is a distinction between "cement" and "concrete," we use the terms interchangeably, as was done at trial.

former law enforcement officer with whom Darice spent her final night; the testimony of Kirkman's girlfriend, Tamiko Smith; four recorded jailhouse phone calls made by Kirkman to Tamiko; the testimony of Officer Eric Austin of the City of Cocoa Police Department; Kirkman's recorded interview with Officer Austin; and video and receipt information from the Home Depot showing Kirkman purchasing a bag of concrete mix, a shovel, and duct tape on the day of Darice's murder.[2] The evidence established the following relevant pre- and post-murder events.

In November 2005, Pratt came to Brevard County, Florida, from the Bahamas for the specific purpose of dealing in narcotics. When Pratt arrived in Florida, he rented a gold Chrysler minivan. He then met up with Kirkman, whom he had previously met through Kirkman's mother. Pratt saw Kirkman on a daily basis, which included staying with Kirkman for about two months in Melbourne at the home of the mother of Kirkman's child, as well as occasionally staying with Kirkman in Rockledge at Tamiko's home. During his time in Florida, Pratt was introduced by Kirkman to Carlos "Los" Buckner and Tony "Bang" Rogers. Pratt

---

2. The remaining evidence presented at trial largely consisted of testimony from various individuals—including the officer who found Darice's remains, a crime scene investigator, a forensic anthropologist, the medical examiner, and a forensic DNA scientist—regarding the burial site, the excavation process, and the testing processes by which Darice's remains were identified.

also had a brother, Patrick "Bongo" Pratt, who came to Florida from the Bahamas at the end of March 2006, not long after Darice's murder.

In the middle of February 2006, Darice, who was twenty-two years old at the time, came to Florida from the Bahamas to visit Pratt. According to Pratt, he and Darice used to date when they were in the Bahamas and although they were no longer boyfriend and girlfriend at the time, they continued a sexual relationship. Darice stayed with Pratt and Kirkman at the home of Kirkman's baby's mother.

On February 28, 2006, two weeks after Darice arrived in Florida, Pratt participated in a robbery with Kirkman and another individual (Page). During the course of the robbery, one of the victims, Parker, was murdered.

On or around March 14, 2006, Pratt and Darice moved together to the Dixie Motel in Cocoa. Soon thereafter, on the night of March 16, 2006, Darice went out to a local bar where she created a disturbance that prompted a phone call to the police regarding her disorderly behavior. Officer Freeman of the City of Cocoa Police Department responded to the call and issued a trespass warning to Darice.[3] Officer Freeman then drove Darice back to the Dixie Motel and the two exchanged

_____

3. Freeman, who was no longer with the Cocoa Police Department at the time of the trial, testified that the woman to whom he issued the trespass warning told him that her name was Tamiko Smith but that he later found out the woman was actually Darice. He identified a picture of Darice and testified that Darice was the woman to whom he issued the warning.

- 5 -

phone numbers. After getting off work at 11 p.m. later that same night, Officer Freeman called Darice and she agreed to go out with him. Officer Freeman changed into civilian clothes and returned to the Dixie Motel in his personal vehicle to pick up Darice. Pratt returned to the Dixie Motel around that same time and saw Darice and Officer Freeman in the vehicle together. Although he did not know Officer Freeman's name, Pratt recognized him as the police officer who had recently conducted a traffic stop in which Kirkman, Rogers, and Pratt were in the stopped vehicle and during which Rogers fled the scene. Pratt approached Officer Freeman's personal vehicle and asked Darice what she was doing with the man. After Darice explained to Officer Freeman that Pratt was her ex-boyfriend and that everything was fine, Darice and Officer Freeman left the Dixie Motel and spent the night together. Pratt admitted to being upset at seeing Darice leave with Officer Freeman.

Pratt then left the Dixie Motel because he was locked out of the room. He went to the Ramada on Merritt Island and called Kirkman to tell him what Pratt had witnessed back at the Dixie Motel. During the call, Kirkman asked Pratt for the officer's name but Pratt did not know. Pratt then went to Tamiko's house to meet with Kirkman sometime around 2 a.m. on March 17, 2006, the day of Darice's murder. There, Kirkman continued to ask Pratt questions regarding the officer's identity. Tamiko, who was home at the time, testified that when Kirkman

- 6 -

received Pratt's late-night phone call, Kirkman got up and was pacing around. Tamiko also testified that after Pratt arrived, she was told that Darice had been drinking and causing problems. Later that morning, Kirkman told Tamiko that he and Pratt were going to take Darice to the airport.

Pratt left Tamiko's house and went back to the Dixie Motel where he found the room door slightly open with no one inside. After resting briefly, Pratt packed up his and Darice's belongings. Pratt testified that he was afraid of Darice's involvement with the police, and he felt that he needed to move from that location because of the narcotics dealing going on there.

Later that same morning of March 17, 2006, Pratt watched Officer Freeman and Darice return to the Dixie Motel. At that time, Officer Freeman recognized Pratt as one of the individuals with whom he had previously made contact on a traffic stop. Officer Freeman left Darice at the Dixie Motel and then left the area. Darice went up to the room, where Pratt told her that it was time to leave and that he did not feel safe. Pratt then loaded up the van with their personal belongings. Darice told Pratt that she was only out having a little fun and that she had met the officer after he responded to a disturbance she had caused at a local bar and grill. Darice, who had been using Tamiko's name, then showed Pratt a pink slip of paper from the Cocoa Police Department indicating the disturbance at the bar.

Pratt and Darice left the Dixie Motel and drove to Tamiko's house. During the drive, Pratt called Kirkman to tell him he was on his way. When Pratt and Darice arrived at Tamiko's house, Kirkman came out through the garage. Pratt saw Tamiko standing in the doorway that leads from the garage into the house, and Tamiko saw Pratt and Darice sitting in the van outside the house. Kirkman then got into the van and left with Pratt and Darice. Tamiko testified that this was the last time she ever saw Darice.

From Tamiko's house, Pratt continued to drive and the three headed toward I-95. Pratt testified that he intended to drop Darice off at the airport but after Kirkman made a phone call, Kirkman instructed Pratt to drive to the home of Rogers' girlfriend. Pratt obeyed. During the drive, they discussed what happened the night before, and Pratt attempted to explain to Kirkman that nothing was going on with Darice and the officer.

Upon arriving at Rogers' girlfriend's home, Pratt parked the van in the backyard by a tree. He and Darice never got out of the van. Instead, Kirkman went inside the house and eventually came back outside with Buckner. Rogers also later came outside. Kirkman approached the van and stated that he did not believe there was nothing going on with Darice and the police officer. Kirkman then instructed Pratt and Darice to stay in the van while Kirkman, Buckner, and Rogers all left together in a car. Certain receipt and store video information

- 8 -

provided by the Home Depot shows Kirkman shortly thereafter walking into the Home Depot store on Merritt Island and, at approximately 12:20 p.m. on March 17, 2006, purchasing an eighty-pound bag of concrete mix, a shovel, and a roll of duct tape.[4] The remaining events leading up to Darice's murder are based solely on the testimony of Pratt.

While Pratt and Darice were sitting in the van awaiting Kirkman's return to Rogers' girlfriend's house, Pratt struck Darice in the face several times because he was angry that she had put the two of them in a life-or-death situation. Kirkman then returned with a shovel, a bag of cement, and a roll of duct tape, all of which Kirkman placed in the front passenger seat area of the van. Kirkman got into the van, took the keys, and did the driving.

Kirkman instructed Pratt to tie Darice's hands together with the duct tape, which Pratt did, and Kirkman then drove the van around for approximately thirty to forty minutes until reaching a dirt road off State Road 524. During the drive, Pratt and Darice attempted to explain to Kirkman that she was not cooperating with the police, but Kirkman informed Pratt that it had to either be Darice's life or the lives of both Pratt and Darice. Pratt was scared of Kirkman.

---

4. Pratt and Tamiko both identified Kirkman in the video.

When Kirkman finally stopped the van off the dirt road, Kirkman, who was carrying a gun, ordered Pratt to use the duct tape to tie up Darice's feet and to cover her mouth. Pratt complied. Kirkman then instructed Pratt to carry Darice towards the woods, to dig a hole to Kirkman's specifications, and to get water from a nearby pond and then mix up the cement, all of which Pratt did. Pratt fetched the water by using a plastic storage bin from the back of the van, and he used the shovel to mix the cement. Kirkman then ordered Pratt to throw Darice in the hole. Pratt complied. Darice was alive and terrified, and her positioning in the hole was such that her upper body was lower than her legs, with her toes extending up out of the hole. While Darice was in the hole, Kirkman pointed his gun at her but did not shoot. Kirkman then ordered Pratt to cover Darice with cement and dirt. Pratt complied. After noticing that Darice's toes were sticking out, Kirkman ordered Pratt to cover her toes with cement. Pratt complied. Kirkman never left the burial scene during this time, and after Pratt finished burying Darice, he and Kirkman left together. They then discarded Darice's clothes at different garbage disposal areas and placed the shovel and duct tape in Tamiko's garage.

In May 2006, Pratt, Kirkman, and Buckner were arrested in South Carolina on unrelated federal charges. Soon thereafter, Florida investigators, acting on leads in the Willie Parker murder investigation, traveled to South Carolina and interviewed all three men. During their interview of Buckner, the investigators

first became aware of Darice's murder. They then returned to Florida and began searching for Darice's body in the same remote, swampy area in Cocoa where Darice's remains would eventually be found four years later. The investigators also went to Tamiko's home. There, they asked Tamiko about Darice and about a minivan that Pratt had rented. They also removed two shovels from Tamiko's garage and requested that Tamiko not tell Kirkman about their visit to her house. But Tamiko promptly told Kirkman about the visit, during several jailhouse calls she received from Kirkman later that same day. The recorded calls were introduced into evidence and played for the jury in their entirety.

During the calls, Tamiko told Kirkman all of the following regarding the visit by police: they were looking for some "stolen goods" in her garage; they asked if she knew Kirkman; they talked about Pratt and wanted to get in touch with Darice; they knew about the van (but the van was not at her house at the time); and they took two shovels from her garage. Kirkman repeatedly instructed Tamiko to remove his belongings from her house. Also, using code language, Kirkman repeatedly instructed Tamiko to have Pratt's brother, Bongo, "torch" the van.[5] Tamiko testified at trial that after Kirkman's third phone call, she followed Bongo to an industry road close to the salvage yard in Cocoa, where Bongo burned the

5. By the time of the third call, Bongo was at Tamiko's house and, using code language, Kirkman spoke directly with Bongo about burning the van.

van.[6] She later testified that the van burned by Bongo was the same van in which she last saw Darice.

In June 2006, Cocoa police spoke with Pratt about Darice (and about Parker).[7] Pratt lied about Darice's whereabouts by telling the investigators that he had dropped Darice off at the airport on March 17, 2006. The investigators also interviewed Kirkman. Prior to interviewing Kirkman, the investigators—based on information received as well as a bar code on one of the shovels they removed from Tamiko's house—were able to obtain video and receipt information from the Home Depot on Merritt Island correlating to the purchase of that shovel on March 17, 2006, along with the purchase of duct tape and a bag of concrete mix.[8] Kirkman's recorded interview with investigators was introduced into evidence and played for the jury in its entirety.

During his one-hour interview with investigators, Kirkman admitted to telling Tamiko and Bongo to "torch" Pratt's rented van but stated that he did so because he knew that the van had been reported as stolen by the rental company and that investigators had asked Tamiko about the van. Kirkman also watched the

---

6. Tamiko testified that she later entered a plea to arson in which she was given probation and avoided prison time.

7. Pratt did not enter into the plea agreement until July 2010, when he again spoke with law enforcement and the State Attorney's Office.

8. The other shovel played no part in the investigation.

Home Depot video and admitted to purchasing the items but stated that he did so for his employer, a company called Rainbow Concrete, and that the owner of the company eventually told Kirkman to keep the shovel. The owner of Rainbow Concrete testified at trial that he never purchased any concrete from Home Depot, that he and his ex-girlfriend were the only individuals who purchased concrete for the business, that he knew Kirkman but Kirkman never worked for him, that he never asked Kirkman to buy any materials for any job, and that he never told Kirkman to keep any shovel.

At the conclusion of the guilt phase, the jury was instructed on both first-degree premeditated murder and first-degree felony murder. On April 8, 2016, the jury returned a verdict of guilty on the sole count of first-degree murder.

**Penalty Phase**

At the penalty phase, the State presented the following six aggravators: (1) that Kirkman was previously convicted of a felony and under sentence of imprisonment or on felony probation; (2) that Kirkman was previously convicted of another capital felony or a felony involving the threat or use of violence to the person; (3) that the capital felony was committed while Kirkman was engaged or an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit any kidnapping; (4) that the capital felony was committed for the sole or dominant purpose of avoiding or preventing a lawful

- 13 -

arrest; (5) that the capital felony was especially heinous, atrocious, or cruel (HAC); and (6) that the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP).

The State introduced evidence that on the day of Darice's murder, Kirkman was still on probation for a felony burglary conviction. In addition to introducing a certified copy of the judgment for the burglary conviction, the State presented the testimony of the following individuals: the correctional probation specialist, a witness to the burglary, and the law enforcement officer who investigated the burglary.

The State also introduced evidence of Kirkman's prior conviction for the first-degree murder of Parker. In addition to introducing a certified copy of the judgment for the murder conviction, the State called Pratt, who testified to the following: he, Kirkman, and Page were involved in the Parker robbery-turned-murder; the robbery was planned by Buckner and Kirkman; Pratt participated at Kirkman's request; Pratt was the driver, while Kirkman and Page each had a gun; and Pratt saw Kirkman twice shoot into the passenger side of Parker's vehicle.[9]

---

9. The State also introduced the testimony of the surviving victim who was in Parker's car with Parker the night Parker was murdered. The surviving victim testified that, among other things, he was sitting in the driver's seat while Parker was sitting in the front passenger seat of the vehicle.

- 14 -

Pratt later testified that Darice did not know about the Parker murder but that she did know about the drug dealing.

The State presented the testimony of Dr. Qaiser, the Medical Examiner, who testified earlier in the guilt phase. Dr. Qaiser concluded that Darice was in a struggle to escape and that her body went into an extreme form of rigor mortis known as cadaveric spasm, which happens when a person is in terror and fear while at the same time trying to escape. Dr. Qaiser testified that Darice's body was maintained in the escape-attempt position because of the "cement-like substance." He also testified that Darice would have lost consciousness within twenty seconds and would have died within four to six minutes.

The State called Officer Austin, who testified earlier in the guilt phase and who was involved in both murder investigations (Darice's and Parker's). Officer Austin testified regarding the progression of both murder investigations, including the relative difficulty investigators were having in finding corroborating evidence against Pratt in the Parker murder case. Officer Austin also testified regarding the plea deal entered into with Pratt and how, up to that point, the authorities were losing hope of finding Darice's body.

The defense then called its only witness, Kirkman's godsister. She testified that Kirkman was the "perfect brother," that they talked every day, that even when

he was incarcerated he made sure she did her homework, and that he was at the hospital for the birth of her first daughter.

The defense proposed the following mitigators: (1) that Kirkman was an accomplice in first-degree murder committed by another person and Kirkman's participation was relatively minor; and (2) any other factors in Kirkman's character, background, or life, or the circumstances of the offense that would mitigate against the imposition of the death penalty.

On April 12, 2016, the jury, by a vote of ten to two, determined that Kirkman should be sentenced to death. In doing so, the jury unanimously found that the State proved five of the six proposed aggravators beyond a reasonable doubt. The jury did not unanimously find the proposed aggravator that the capital felony was committed for the sole or dominant purpose of avoiding or preventing a lawful arrest. Kirkman declined a presentence investigation, waived a Spencer[10] hearing, and chose to go straight to sentencing.

**Sentencing**

On April 29, 2016, the trial court sentenced Kirkman to death for the first-degree murder of Darice. The trial court found the same five aggravators that were unanimously found by the jury: (1) Kirkman was previously convicted of a felony

---

10. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 16 -

and under sentence of imprisonment or placed on community control or on felony probation (great weight); (2) Kirkman was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (3) the crime was committed while Kirkman was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any kidnapping (substantial weight); (4) HAC (very great weight); and (5) CCP (great weight). The trial court declined to consider the sixth aggravator presented by the State—that the capital felony was committed for the sole or dominant purpose of avoiding or preventing a lawful arrest. The trial court noted that the jury did not unanimously find the existence of that aggravator.

Additionally, the trial court found the following sole mitigator: Kirkman was caring and helpful towards his relatives (moderate weight). The trial court determined that the other proposed mitigator—that Kirkman was an accomplice whose participation was relatively minor—was not reasonably established by the evidence. Instead, the trial court determined that the evidence showed that Kirkman played a major role in the planning and carrying out of the murder.

Lastly, the trial court addressed whether a death sentence for Kirkman would be disproportionate when compared to the ten-year sentence received by Pratt for his plea to second-degree murder. The trial court rejected a relative culpability

mitigator, finding that Kirkman intended to kill Darice, was a major participant in the underlying felony, and demonstrated a reckless indifference to human life. The trial court noted that the evidence established that Kirkman planned, directed, and controlled every aspect of the murder.

This appeal follows.

## ANALYSIS

On appeal, Kirkman raises and properly briefs only one distinct guilt phase claim. Namely, he argues that the trial court reversibly erred by allowing Pratt to testify that he and Kirkman were involved in the Parker murder. For the reasons explained below, we conclude that Kirkman is not entitled to a new guilt phase on this issue.[11]

Kirkman also raises three penalty phase issues: (1) his death sentence violates Hurst; (2) Florida's death penalty scheme is unconstitutional in that it fails to narrow the category of cases eligible for the death penalty; and (3) his death sentence is disproportionate when compared to Pratt's sentence, in violation of

---

11. Kirkman also asserts that the trial court committed "serious constitutional error" by allowing the jury to watch the portion at the very end of Kirkman's one-hour interview with investigators that shows the investigators concluding the interview after Kirkman invokes his right to remain silent and to an attorney. However, Kirkman concedes that the issue was not preserved for appellate review through a contemporaneous objection, and he presents no argument for fundamental error on appeal. We do not consider this issue.

Enmund[12] and Tison.[13]  Because we conclude that Kirkman is entitled to a new

penalty phase under Hurst, we decline to address any other penalty phase claims,

as we have similarly declined to do in other recent cases on direct appeal.  See,

e.g., Davis v. State, 217 So. 3d 1006, 1020 (Fla. 2017).

In addition to addressing Kirkman's guilt phase claim and his Hurst claim,

we conduct an independent review of whether the evidence in this death penalty

case was sufficient to sustain Kirkman's first-degree murder conviction.

**Guilt Phase Claim**

Prior to trial, the State filed a Notice of Intent to Offer Evidence of Other

Criminal Offenses (Williams[14] Rule Evidence) under section 90.404(2), Florida

Statutes (2015), proposing to introduce certain evidence regarding the Parker

murder, including that Pratt and Kirkman were both involved, that Pratt watched

Kirkman shoot and kill Parker, and that Kirkman ordered and directed Pratt to

assist in murdering Darice because Kirkman thought she was providing

information to the police regarding the Parker murder.  The State argued that the

evidence was relevant both to show that Kirkman had a motive to kill Darice and

to show why Pratt was fearful of Kirkman.  The State also theorized that the

---

12.  Enmund v. Florida, 458 U.S. 782 (1982).

13.  Tison v. Arizona, 481 U.S. 137 (1987).

14.  Williams v. State, 110 So. 2d 654 (Fla. 1959).

evidence was "inextricably intertwined with the homicide of Darice Knowles."[15] Defense counsel argued that the incidents were not necessarily intertwined and that the State should be "severely limited in bringing in this prior criminal history aspect." Defense counsel also argued that the case was about Pratt being mad that his girlfriend went out with a police officer.

The trial court determined that the Parker murder issue involved pure relevancy-type questions as opposed to actual Williams rule issues. The court determined that "parts of" the Parker murder could be "inextricably intertwined" and relevant. Namely, the court determined that it was relevant to prove motive, that is, that Pratt was directed and ordered to assist in murdering Darice because of the belief that she was providing information to the police about the Parker murder. The trial court thus allowed the State to mention the Parker murder and that Pratt and Kirkman were both involved. But the court determined that going into the specifics of the Parker murder was unnecessary and would be unfairly prejudicial. The judge concluded that the State would have to establish Pratt's fear of Kirkman

---

15. The State also sought to introduce evidence of (1) events surrounding the arrest of Pratt, Kirkman, and Buckner in South Carolina for federal drug and weapons offenses, and (2) Kirkman's involvement in the burning of Pratt's rented minivan. The trial court ultimately determined that the South Carolina arrest was generally unrelated to Darice's murder and that no specifics of that arrest could be discussed at trial, but the jailhouse phone calls and the burning of the van were relevant and admissible. The trial court's rulings on these matters are not at issue in this direct appeal.

without mentioning that Kirkman shot and killed Parker.  In short, Pratt could "say that he was indicted along with Mr. Kirkman and agreed to testify" but could not mention the gun or that Kirkman shot Parker.  The State complied with the trial court's ruling.

During opening statements, the State mentioned the Parker murder without going into any specifics.  The State recounted that Darice was killed because Kirkman thought that Darice was talking to the police about his and Pratt's activities.  The State also mentioned that Pratt was under indictment, along with Kirkman and Page, for the murder of Parker.  And the State mentioned that in 2010, while Pratt's case for his involvement in the Parker murder was still pending, Pratt made a deal with the State that was contingent on him showing law enforcement where Darice's body was located and on him testifying truthfully against Kirkman in both homicide cases.  Lastly, the State later mentioned that Pratt would be given a total of twenty years, and ten years' probation, to testify truthfully against Kirkman in both cases.

A review of Pratt's testimony during direct examination reveals certain brief exchanges regarding the Parker murder.  Namely, it was mentioned that in June 2006, Cocoa police spoke with Pratt about Darice and Parker.  It was also mentioned that shortly thereafter, Pratt, Kirkman, and Page were all indicted for the Parker murder.  And it was mentioned that Pratt later entered into a plea

- 21 -

agreement.  Finally, after a sidebar, the trial court allowed Pratt to state the date of the Parker murder—which was two to three weeks prior to Darice's murder—to attempt to show why Pratt was afraid of Kirkman.  The State did not mention the Parker murder in any other part of the guilt phase, including closing remarks.

Kirkman argues that the trial court erred by not limiting Pratt's testimony concerning the specific criminal activity that Kirkman might have feared was being communicated by Darice to the police.  Kirkman concedes that it was relevant and probative for the jury to hear that he and Pratt were engaged in an ongoing criminal enterprise at the time of Darice's murder but argues that informing the jury about the specific crime of murder was unduly prejudicial and its relative probative value was negligible.  We conclude that the trial court did not abuse its discretion regarding this evidentiary matter.

A trial court's determination that evidence is admissible will not be disturbed unless the trial court abused its discretion.  See McGirth v. State, 48 So. 3d 777, 786 (Fla. 2010).  "That discretion, however, is limited by the rules of evidence."  Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008).  With respect to collateral crimes evidence, this Court has long noted that such evidence falls into one of two categories: similar fact evidence, which is considered Williams rule evidence, and dissimilar fact evidence.  McGirth, 48 So. 3d at 787.  The former is governed by section 90.404, Florida Statutes, whereas the latter is governed by the

general rule of relevancy in section 90.402, Florida Statutes (2015). Id. This Court has described admissible dissimilar fact evidence as follows:

> Thus, evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue. . . . [I]t is necessary to admit the evidence to adequately describe the deed."

Griffin v. State, 639 So. 2d 966, 968 (Fla. 1994) (alterations in original) (quoting Charles W. Ehrhardt, Florida Evidence, § 404.17 (1993 ed.)). Ultimately, "evidence that helps to put the entire case into perspective" is admissible "to the extent that its relevance is not outweighed by its prejudicial effect." Kopsho v. State, 84 So. 3d 204, 212 (Fla. 2012).

In the instant case, the trial court concluded that the Parker evidence was not true Williams rule evidence and should be analyzed under the general relevancy provisions. We agree. Consequently, the trial court's decision is reviewed under section 90.402 and the general rules of relevancy.

Here, the evidence relating to Parker's murder helped to establish the relevant context and "was relevant to developing the circumstances leading up to the murder." Bradley v. State, 787 So. 2d 732, 742 (Fla. 2001). The State attempted to show that Kirkman had a sufficient motive to have Darice killed and to show why another person, Pratt, would agree to do the killing at Kirkman's command. The State's theory of motive was consistent with Pratt's testimony

- 23 -

regarding Kirkman's repeated inquiries into the identity of the police officer who picked up Darice at the Dixie Motel, as well as with Pratt's repeated statements to Kirkman that Darice was not cooperating with the police. The State's theory was also consistent with Tamiko's testimony that she was told that Darice had been causing problems. And it was consistent with Tamiko's testimony that Kirkman was pacing around after Pratt called him in the early morning hours of March 17, 2006, the day of Darice's murder. In short, "[t]hese factors were necessary to adequately describe the events leading up to [the victim's] murder." McGirth, 48 So. 3d at 787. The evidence at issue that Kirkman was involved in Parker's murder thus was that a murder took place: (1) after Darice arrived in Florida; (2) less than three weeks before Darice's murder; and (3) in which Pratt, the man whom Darice came to visit and with whom Darice stayed, also participated. This evidence was relevant to and inextricably intertwined with the crime charged. See id.

Even though dissimilar fact evidence may be relevant, a trial court "must also balance whether the probative value of the relevant evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence." Truehill v. State, 211 So. 3d 930, 945 (Fla. 2017). This Court has held that introduction of evidence of

- 24 -

dissimilar bad acts, even when otherwise relevant, constitutes reversible error

when the trial court allows the evidence to become a feature of the trial:

> This Court has explained that "relevant evidence of collateral crimes impermissibly becomes a feature of the trial when the evidence 'transend[s] the bounds of relevancy to the charge being tried' and the prosecution 'devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.' " Peterson v. State, 2 So. 3d 146, 155 (Fla. 2009) (alteration in original) (quoting Conde v. State, 860 So. 2d 930, 945 (Fla. 2003)). Where evidence does, in fact, become a feature of the capital trial, reversible error will result.

McCray v. State, 71 So. 3d 848, 877 (Fla. 2011).[16]

Here, the trial court did not allow the relevant dissimilar fact evidence to

impermissibly become a feature of the trial. Instead, the trial court carefully

examined and ruled on the State's Notice of Intent by restricting the evidence so

that it did not unfairly prejudice Kirkman. The State then proceeded within the

confines established by the trial court. Namely, the State generally mentioned the

indictment three times during opening statements and on a few brief occasions

during its direct examination of Pratt. The State did not mention any specifics of

the Parker murder, including that Pratt watched Kirkman shoot Parker. And the

---

16. This Court has also held that errors with respect to the introduction of dissimilar fact evidence are subject to the harmless error test. See, e.g., Delhall v. State, 95 So. 3d 134, 167 (Fla. 2012) (finding harmless error in the guilt phase even though, among other things, "the State presented a substantial body of evidence . . . that exceeded the scope of evidence necessary to simply prove" the defendant's motive to commit the murder).

State did not mention the Parker murder at any other time during the guilt phase, including during closing. The record simply does not support the conclusion that the evidence became "a feature of the capital trial." McCray, 71 So. 3d at 877; see also Sexton v. State, 775 So. 2d 923, 929-30 (Fla. 2000) (concluding that collateral bad acts testimony regarding the mysterious death and subsequent burial of the defendant's infant grandchild was admissible because: (1) it was relevant to explain the defendant's motive for killing his son-in-law (the father of the dead baby) and to show that the defendant had sufficient control over the defendant's mentally challenged twenty-two-year-old son such that the son would agree to physically commit the murder at the command of the defendant; and (2) "there were no graphic details of the infant's death or burial" and the testimony "did not become the focal point of the trial"). Although the evidence regarding the Parker murder was obviously prejudicial, it cannot be said that the danger of unfair prejudice substantially outweighed the probative value. § 90.403, Fla. Stat. (2015); see also Victorino v. State, 23 So. 3d 87, 100 (Fla. 2009) ("On this record, we cannot say that the trial court abused its discretion in admitting the challenged evidence."). Accordingly, the trial court did not abuse its discretion.

Lastly, Kirkman attempts to support his argument that he was unfairly prejudiced during the guilt phase by pointing to the following two events that subsequently took place during the penalty phase: (1) Pratt testified that Darice

knew of their drug dealing but did not know of their involvement in the Parker murder; and (2) the jury rejected the State's proposed witness-elimination aggravator. Even assuming that these penalty phase events are pertinent to Kirkman's guilt phase claim, his arguments do not merit a new trial.

As an initial matter, the issue of whether Darice had actual knowledge of the Parker murder is not the same as the issue of whether Kirkman <u>believed</u> she had or may have had such knowledge. And as to the proposed witness-elimination aggravator, it is simply unknown why the jury did not unanimously find that the aggravator was proven beyond a reasonable doubt.[17] We decline to speculate regarding the many possible reasons. What is known, however, is that the disputed evidence was relevant to prove the State's theory of the case and was not unfairly prejudicial. What is also known is that the jury unanimously concluded that Kirkman was responsible for Darice's murder. As explained next, there was competent, substantial evidence to support the jury's conclusion.

### Competent, Substantial Evidence

Kirkman does not separately challenge the sufficiency of the evidence. Nevertheless, this Court independently reviews the record in all death penalty cases to determine whether competent, substantial evidence supports the

---

17. It is unknown how many jurors actually concluded that the aggravator was not proven beyond a reasonable doubt.

conviction.  See Fla. R. App. P. 9.142(a)(5); Pham v. State, 70 So. 3d 485, 501 (Fla. 2011).  In conducting its independent review, this Court "view[s] the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt."  Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006).

Here, Kirkman was charged with first-degree premeditated murder.  Because the indictment charged premeditated murder, the State was permitted to prosecute Kirkman "under alternative theories of premeditated and felony murder."  Kearse v. State, 662 So. 2d 677, 682 (Fla. 1995).  Indeed, the jury was instructed on both first-degree premeditated murder and first-degree felony murder, with the underlying felony being kidnapping.  The jury then found Kirkman guilty of first-degree murder but did not specify whether the State proved premeditated murder, felony murder, or both.  Consequently, Kirkman's conviction should be upheld if "the evidence is sufficient to establish either felony murder or premeditation."  Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).  We conclude that there is competent, substantial evidence to support Kirkman's conviction under either form of first-degree murder.

Regarding first-degree premeditated murder, the State produced direct evidence from Pratt that Kirkman planned, ordered, and directed the murder, including that Kirkman supplied the items used in the murder.  Pratt testified to the

timeline of events that culminated in the murder, beginning with Pratt seeing Darice with an off-duty police officer and then promptly telling Kirkman about it. Pratt testified that Kirkman believed Darice was cooperating with police and that Kirkman ordered Pratt to bury Darice or else both he (Pratt) and Darice would be killed. Pratt also testified to the details of the murder, including that Kirkman drove around for more than thirty minutes before selecting the burial site and that Kirkman, who was carrying a gun, then directed and controlled every step in the process.

Pratt's version of events was corroborated by the testimony of Tamiko, Kirkman's girlfriend. She testified that Pratt called Kirkman and then came over around 2 a.m. on March 17, 2006, the day of Darice's murder. She also testified that Kirkman was pacing around after receiving Pratt's call. And she further testified that after Pratt left her house and then came back with Darice later that morning, Kirkman got into the van and left with the two of them. Pratt's version of events was also corroborated by the video from Home Depot showing that instead of taking Darice to the airport as Kirkman had told Tamiko they were going to do, Kirkman instead went to the local Home Depot and purchased a shovel, a bag of concrete mix, and a roll of duct tape—the very three things used to murder Darice later that same day. And Pratt's testimony regarding the physical

details of the burial was corroborated upon the discovery and examination of Darice's remains.

Based on a review of the evidence in this record, we conclude that the jury could have found that Kirkman had a "fully formed conscious purpose to kill." Asay v. State, 580 So. 2d 610, 612 (Fla. 1991). We also conclude that premeditation can be inferred in this case simply from "the manner in which the homicide was committed." Bradley, 787 So. 2d at 738 (quoting Norton v. State, 709 So. 2d 87, 92 (Fla. 1997)). The testimony of both Pratt and the Medical Examiner showed that Darice was alive and bound with duct tape at the time she was buried. The evidence also showed that Kirkman made a conscious decision to purchase the burial supplies from Home Depot and then to stand over and direct the burial process, including the pouring of concrete over the victim. It is evident that Kirkman "had time even after he began" orchestrating and directing the process "to stop himself before" the murder was completed. Sparre v. State, 164 So. 3d 1183, 1200 (Fla.), cert. denied, 136 S. Ct. 411 (2015); see also Patrick v. State, 104 So. 3d 1046, 1063 (Fla. 2012) ("The record here demonstrates sufficient evidence for the jury to have inferred that [the defendant] did intend for [the victim] to die."). In short, there is competent, substantial evidence here to support a conviction of first-degree premeditated murder.

Regarding first-degree felony murder, with the underlying felony being kidnapping, the trial court gave the standard jury instructions. See Fla. Std. Jury Instrs. (Crim.) 7.3, 9.1. To specifically prove the underlying felony of kidnapping, the State was required to prove the following three elements beyond a reasonable doubt: (1) Kirkman forcibly, secretly, or by threat, confined, abducted, or imprisoned Darice against her will; (2) Kirkman had no lawful authority to do so; and (3) Kirkman acted with intent to inflict bodily harm upon or to terrorize Darice or another person. See § 787.01(1)(a), Fla. Stat. (2005); Fla. Std. Jury Instr. (Crim.) 9.1.

Here, the evidence established that Darice was unlawfully abducted against her will and that Kirkman intended to inflict bodily harm upon or to terrorize her. Indeed, the evidence established that Kirkman intended for Darice to be buried alive. Again, the State produced direct evidence from Pratt that Kirkman planned, ordered, and directed the kidnapping and murder. That planning included: (1) Kirkman purchasing and supplying the items, including the duct tape; (2) Kirkman driving Pratt and Darice around until personally selecting the burial site; and (3) Kirkman ordering Pratt to restrain Darice with the duct tape to prevent her from escaping. In addition to Pratt's testimony, Tamiko's testimony placed Kirkman in the van with Pratt and Darice on the day of the murder, the Home Depot video shows Kirkman then purchasing the murder items, and the discovery and

- 31 -

examination of Darice's remains confirmed that her hands and feet had been bound with duct tape and that her mouth had been covered with duct tape. Lastly, Pratt and the Medical Examiner both testified that Darice was alive at the time she was buried, and Pratt testified that Darice was terrified during the ordeal.

Based on a review of the evidence in this record, we conclude that competent, substantial evidence exists to support a conviction of first-degree felony murder. The evidence supports the conclusion that Kirkman played a significant role not just in the kidnapping but in the murder itself.

### Penalty Phase Claim—Hurst

We vacate Kirkman's death sentence and remand for a new penalty phase under Hurst. Under this Court's precedent, the jury's nonunanimous recommendation of death in this case violates Hurst, and that error is not harmless beyond a reasonable doubt.[18]

In January 2016, the United States Supreme Court issued its decision in Hurst v. Florida, in which the Court held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth

---

18. Hurst applies to the instant case, which is before this Court on direct appeal. See White v. State, 214 So. 3d 541, 549 (Fla. 2017).

Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619.

During the pendency of Kirkman's appeal, on remand in Hurst, this Court held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

Hurst, 202 So. 3d at 57. This Court also determined that Hurst errors are capable of harmless error review. Id. at 67. Since issuing Hurst, this Court has repeatedly declined to find harmless Hurst error when the jury nonunanimously recommends to impose death, including in the context of ten-to-two jury recommendations. See, e.g., Banks v. State, 219 So. 3d 19, 32-33 (Fla. 2017); Abdool v. State, 220 So. 3d 1106, 1115-16 (Fla. 2017).

Here, during the penalty phase, the jury unanimously found that the State proved five of its six proposed aggravators. But the jury did not unanimously recommend death, instead recommending death by a vote of ten to two.[19] Under

---

19. Before Kirkman's trial began in 2016, certain recent amendments to Florida's capital sentencing scheme had gone into effect. Those amendments, which were made shortly after the Supreme Court decided Hurst v. Florida in January 2016, included the new requirement that in order for the jury to recommend a sentence of death, at least ten jurors must vote for a sentence of

this Court's precedent, we are "unable to determine or speculate why the dissenting jurors . . . voted for a sentence of life imprisonment rather than the death penalty." Davis, 217 So. 3d at 1020; see also Sexton v. State, 221 So. 3d 547, 559 (Fla. 2017) ("In light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict was harmless."). Because the Hurst error was not harmless beyond a reasonable doubt, we vacate Kirkman's death sentence and remand for a new penalty phase.

## CONCLUSION

For the reasons stated above, we affirm Kirkman's conviction, vacate Kirkman's death sentence, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

---

death (as opposed to a simple majority). See ch. 2016-13, §§ 3, 7, at 4, 23, Laws of Fla.; see also § 921.141(2)(c), Fla. Stat. (2016). After Kirkman was convicted and sentenced, this Court determined the Legislature's ten-vote requirement to be unconstitutional because it fell short of "the constitutionally required unanimous, twelve-member jury." Perry v. State, 210 So. 3d 630, 640 (Fla. 2016).

I fully concur in that portion of the opinion affirming Kirkman's conviction and concur specially in the reversal of Kirkman's death sentence.  See Okafor v. State, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially).

An Appeal from the Circuit Court in and for Brevard County,
Jeffrey Francis Mahl, Judge - Case No. 052012CF032155AXXXXX

James S. Purdy, Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

for Appellee